MARY WARNER, Appellant, v. MARY TULLIS et al., Appellees.

MARCH 13, 1928.

REHEARING DENIED SEPTEMBER 28, 1928.

*Sam Abramson,* for appellant.

*W. G. Harvison,* for appellees.

MORLING, J.—As a preliminary statement of the questions raised, sufficient to assist in the application of the evidence, it may be said that plaintiff claims that the deed in controversy was made to her father, Peter Johnson, by W. H. Davis, the

vendor of Amos L. Tullis, to secure the repayment of $400, money advanced by Johnson to Tullis, to pay for the property, and that by later agreements the property was to be held by Johnson as security for the repayment of money advanced to pay the cost of material, to pay a judgment on mechanic's lien, and to pay taxes and insurance and the expense of the funeral of A. L. Tullis. Defendants' contention is that the deed was made to Peter Johnson because of an anticipated lawsuit; that there was never any agreement that the property might be held as security.

Prior to February 5, 1907, W. H. Davis was the owner of the legal title to the property in question, then vacant lots. He had agreed to sell them to Amos L. Tullis, or perhaps to Amos and his wife, Mary Tullis. Mary Tullis testifies that her husband paid for the lots.

"We were living on a farm, and we paid out of the grain and stuff we sold, and then he sold a horse. * * * We had the lots already bought and paid for before we left the farm."

She also says:

"I had some trouble with a schoolma'am, and she had me arrested, and we had a trial in the district court here, and she beat me, and Mr. Ryan [her attorney] said or asked if we had any property or lots or anything in our name. I told him we had six lots. We then deeded them out of our name. Mr. Ryan said they might put a judgment against us, and they might take the lots, and that the best thing to do to make it safe was to deed them."

On January 23, 1907, A. L. Tullis and Mary Tullis made a quitclaim deed of the lots to Peter Johnson, for the recited consideration of $1,000. Peter Johnson was the brother of Mary Tullis. There is no claim that any consideration was paid for this quitclaim deed. On February 5, 1907, W. H. Davis and wife made a warranty deed (Exhibit B) for the lots to Peter Johnson, for the recited consideration of $420. Davis testifies that he never saw Peter Johnson; that Tullis told him the reason he wanted the deed made to Peter Johnson was that:

"His wife had some trouble with a school-teacher at Saylorville about something in the school in regard to the children,

and he was afraid that this school-teacher would sue them and get judgment against them, and for that reason he didn't want the property tied up, and he would have it put in Peter Johnson's or the man that appears in that deed."

Davis says that, before the deed was made, he took in a horse at $125 as part payment, and the cash was paid when the deed was turned over.

A house was built on the lots in 1909. Tullis moved in, the last of August, 1909, and it has been occupied by the Tullis family as a home ever since. On June 17, 1909, Amos L. Tullis and Mary Tullis gave their note (Exhibit D) to Peter Johnson for $400, due June 17, 1910. On August 16, 1909, they gave another note (Exhibit E) to Peter Johnson for $150, due August 16, 1910. Plaintiff's claim is that the first note was for money borrowed to pay for the lots, and the second for money borrowed to pay for material used in the house, and that it was orally agreed between Peter Johnson and A. L. Tullis that Peter Johnson should take the Davis deed of the lots, to secure payment of the money advanced by him to pay for them, and that, when the $150 was loaned, it was further agreed orally that the property was to be security for its repayment. Peter Johnson died April 11, 1911, leaving a widow, Mary, and several children, including plaintiff. The widow and other children have assigned all their rights to plaintiff. A. L. Tullis died November 29, 1912, leaving, besides his widow, a number of children surviving, some of whom were minors. The Tullis family did not have the means to pay the funeral expenses, and Mary Johnson, widow of Peter, paid them, amounting to $96.25. It is the claim of the plaintiff that Mrs. Tullis agreed that the property in controversy should stand as security for their payment.

On January 23, 1912, a mechanic's lien against this same property was foreclosed in a suit originally commenced against Peter Johnson and Amos L. Tullis, in which Mary Johnson, as executrix of Peter Johnson, was substituted as defendant for Peter Johnson. Personal judgment was not rendered. Mrs. Johnson paid the amount found due on the lien, $259.95, and took therefor Mrs. Tullis's note, dated December 2, 1912, due in one year. It is plaintiff's claim that Mrs. Johnson, by agree-

ment with Mrs. Tullis, was to hold this amount also as a claim against the property.

From 1912 to 1923, Mrs. Johnson paid the taxes and special assessments against the property, aggregating a large amount. She alleges she also paid insurance premiums in 1920 and 1923, to the amount of $54. For the total of all the foregoing amounts, with interest, less payment of $20 ($4,173.43), plaintiff claims the establishment and foreclosure of a lien upon the property.

I. Was the deed taken to Peter Johnson to secure repayment of money advanced by Johnson to Tullis to pay for the property? The testimony to support plaintiff's contention is given by her husband, two brothers, and a sister. Walter Johnson says that Tullis gave the Davis deed to Peter Johnson "in my presence in February, 1907, * * * Mr. Tullis came over to Pella and asked my father to advance some money to buy these lots, and told my father there could be some money made on them; and father consented to do that, and he advanced him the money, and for that reason took over the lots,—took the [Davis] deed. * * * Don't remember exactly how much money was advanced at that time, but I think there was a note given at the same time or later, and it was agreed that, when Mr. Tullis refunded the money, my father was to deed the property back to him." He says:

"My father gave Mr. Tullis $400, at the time of the conversation. I know he gave him the money to pay on the lots. Exhibit D is a note for $400 given to buy the lots. He gave the note after the deal was made, I suppose. I know he gave a note afterwards. I don't know whether he gave the note for $400 at the meeting. * * * I know what the note was for, because my father told me. * * * I did not see him turn over the $400, but I know he would not tell me that he gave him the $400 if he had not given it to him."

Another son testifies that the $400 note was given for part payment of the lots and house.

"I can't account for the fact that the deed, Exhibit B, is dated February 5, 1907, and the note, Exhibit D, is dated January [June] 17, 1909, unless the note was given afterwards * * * Father said he would let Mr. Tullis have it [the money], and Mr. Tullis said he would give my father a

deed for the security, and make out notes for the money advanced to buy the property. The $400 note represents money that was to help buy the property. * * * I can't explain why the note was made two years after the deed. Mr. Tullis may have given a new note.''

Plaintiff's husband testifies:

''Tullis came to Pella to borrow some money from Peter Johnson to pay for these lots. He wanted to borrow $400. And my father-in-law let him have $400. I was present when he let him have it, and for that money, Tullis deeded him those lots as security. I was present when the money was actually paid. It was paid in currency in bills. * * * When the money was repaid, he was to give back the lots. * * * there was a note given for $400 at that time. Exhibit D is the note given for the $400 loaned. This note, Exhibit D, was not given at that time. * * * Mr. Johnson was to get a deed for that property at that time, but later on I think Tullis gave that note. * * * Mr. Tullis gave a deed at the time. He gave the deed Exhibit B.''

Plaintiff's sister says that she saw her father give Tullis the money; that Tullis was to give her father ''a deed for security on the lots for the money advanced him. * * * I was present during another conversation between father and Mr. Tullis at the Johnson home, a few years later. Mr. Tullis asked for $150 to buy some lumber with, to start to build a home. He got the money. It was to be paid back, and I think at that time Mr. Tullis gave father notes, and the property involved in this controversy was to be security for the repayment of the money.''

She also says:

''I did not see the deed, Exhibit B, at the time Mr. Tullis was talking to my father about borrowing the $400 to buy the lots. There was no note executed at that time for the $400. The note was given him later. Exhibit D is the note given later. I recognize the note. I do not know who handed it to Peter Johnson. I saw father hand mother the note after he got it. I was not present when father got the note. Mr. Tullis came another time, and asked father for $150 to buy

some lumber to build a house. Father gave him the money. At that time, Mr. Tullis gave father that note for $150. It was about two years after the first interview.''

The widow, Mary Johnson, was not a witness. It is explained that, at the time of the trial, she had high blood pressure, and was ill; but it is not shown that she could not have been present, or that her deposition could not have been taken. Davis's testimony is to the effect that the sale was practically a cash deal, and, as has been said, that he took in a horse at $125 or $150, and turned over the deed to Tullis when Tullis brought him the cash. The deed recites a consideration of $420, the amount of which paid in cash would not be over $295. The deed is dated February 5, 1907; whereas the note for $400 was given in June, 1909, about the time the house was being built. Mrs. Tullis testifies that the lots were paid for from crops, that:

''The $400 was got to finish the house, and then my husband wrote to my brother Peter for $150, and that is what the note Exhibit E is for. The money was used for finishing the house. Exhibit D is dated June 17, 1909, for money to build the house, and Exhibit E is dated August 16, 1909, to finish the house.''

Mrs. Tullis was asked whether there was any agreement or understanding that Peter Johnson should hold the Davis deed as security for the repayment of these different indebtednesses, and, over objection that it was a conclusion, testified that there was not. She testified also, without objection:

''There was no agreement or understanding that any moneys they might advance to finish the house should be secured by this Davis deed.''

Plaintiff's witnesses testify to a request made by Mrs. Tullis in 1923 for a settlement, and to a statement made by her that she would have to sell the property, and also that she agreed to pay $20 a month, and that one $20 payment was made through the mail. They testify that this payment was made in 1923. Plaintiff pleads that it was made July 3, 1920. The letter inclosing the $20 which they produce is dated July 3, 1920. It purports to be signed by one of Mrs. Tullis's sons, and states:

"I suppose you thought we were slow about sending. you your money for the rent * * * We will pay $20 each month till I can sell the place."

This son, Tullis, denies writing or authorizing anyone to write the letter, or knowing anything about it. Plaintiff produces also a purported letter from Mary Tullis, dated August 28, 1923, stating:

"Will write you a few lines this afternoon in answer to your letter of August 3d, which Walter wrote stating that mother owned the property; there is a great mistake. We both have a interest in this place and I want you folks to understand it that way. * * * Walter stating in his letter that mother owns the property and will ask no advice of anyone to what price they would put the property on, now he does have to ask some advice for you understand we have an interest in it. I don't know how he gets that way. Now don't you folks think that you and I had better divide the property up without any further trouble for I am going to be fair and do the right thing by you folks. Now say you take the house and one lot for your part. That would more than pay you folks and I take the lots. * * * "

Mrs. Tullis denies writing or authorizing this letter, and it is apparent from the contents that she did not write it. It cannot be found that the $400 was obtained in 1907, or to pay the purchase price of the lots or that the Davis deed was taken to Johnson to secure its repayment.

With respect to the $150 note, Walter and William do not testify. Plaintiff's husband testifies that Tullis came to Pella, said he had an opportunity to buy some lumber, and wanted $150 to build on the lots. He does not say that he was present at the transaction, but says that Tullis stopped in witness's place of business, and said he was very thankful to Peter, "that he had let him have the money, and that he would build now on those lots." The testimony of plaintiff's sister and of Mrs. Tullis on this subject has been set out.

It is to be noted that, in her substituted petition, plaintiff alleges the $400 loan to have been made to Amos and Mary Tullis, pursuant to an oral agreement, for the purpose of completing the payment of the purchase price of the lots, and that Peter Johnson, "with the consent and approval of the said

Amos Tullis and Mary Tullis, obtained and received a conveyance by warranty deed * * * That, in accordance with said oral agreement, the said Mary Tullis and Amos Tullis, on or about the 23d day of January, 1907, quitclaimed their interest in said real estate above described to the said Peter Johnson * * * That said oral agreement provided that the said Peter Johnson, also known as Peter Jansen, was to take the title to the above described real estate, and to reconvey the same to the said Amos Tullis and Mary Tullis upon the repayment of the moneys paid out.''

That Amos and Mary Tullis were the equitable owners of the lots is, therefore, alleged. The parties in evidence did not go into that question, further than has been indicated. The Tullises evidently had a vendee's interest in the lots on January 27, 1907, when they made the quitclaim deed. They acquired the full equitable ownership when the deed to Johnson was made, February 5, 1907. The loans were made more than two years later,—1909. The plaintiff's witnesses do not claim that Mary Tullis was a party to the agreements that the deed should be held for the $400 loan or the $150 loan. We must hold that these loans were not made until 1909. The defendants pleaded the statute of frauds, but apparently only with reference to the claim for funeral expenses. Objection was made to the competency of the testimony of plaintiff's witnesses, but it seems to have been made under Section 11257, ''the dead man's statute.'' We think it sufficiently appears that the testimony of plaintiff's brothers, sister, and husband (excepting the husband's testimony concerning the $150 loan) did not relate to personal transactions or communications between them and A. L. Tullis, and that the section last cited is inapplicable. Evidence of the merely oral agreement of the owners of a previously vested equitable estate that the holder of the legal title shall have a lien or mortgage upon it would seem to be inadmissible, if proper objection were made. Code of 1927, Section 11285; 41 Corpus Juris 467; 27 Corpus Juris 218; *Stoddard v. Hart*, 23 N. Y. 556.

Mrs. Tullis was interested in the equitable estate at the time the loans were made, in 1909. Whether she had more than an inchoate dower interest at that time is not clear, but her inchoate interest has ripened into an absolute one-third interest

(or a homestead right). There is no evidence that she agreed to the alleged lien. The testimony offered by plaintiff consists so much of conclusions, is so full of inconsistencies, and indicates so much hearsay that we are unable to find that A. L. Tullis agreed to such a lien. It cannot be held that the relationship of mortgagor and mortgagee existed between the Tullises and Johnson.

II. With respect to the money advanced for funeral expenses, Mrs. Tullis and her children then had homestead rights in the property. The funeral expenses were a claim against the estate. Her agreement that the expenses paid by Mrs. Johnson were "to stand against the property," if made, would manifestly be of no validity.

III. The mechanic's lien and taxes have been paid. No personal claim against any of the defendants on account of any of the items in controversy is made. Mrs. Tullis testifies that there was no understanding that the money paid to settle the mechanic's lien or to pay the taxes should stand as a charge against the property. The plaintiff's witnesses claim that there was such an agreement with respect to the money paid on the mechanic's lien but make no such claim with respect to money paid for taxes. They do say that the Johnson family were asked to pay the taxes. It cannot be found that there was any agreement for a lien for reimbursement for money paid on the mechanic's lien and taxes. In view of our conclusion on another branch of the case, we need give this subject no further attention at this place.

No evidence on the claim for insurance premiums paid was offered.

IV. All three notes were due more than ten years before this action was begun. The money paid for funeral expenses and much of that paid for taxes was paid more than five years before suit brought. The parties argue the statute of limitations, as reciprocally running against both suit to foreclose and suit to redeem. *Fitzgerald v. Flanagan*, 155 Iowa 217; *Jarl v. Pritchett*, 190 Iowa 1269; *Richards v. Crawford*, 50 Iowa 494; *Mahaffy v. Faris*, 144 Iowa 220; *Burdick v. Wentworth*, 42 Iowa 440; *Lindberg v. Thomas*, 137 Iowa 48. Our

690

conclusions on other subjects make superfluous a discussion of the statute of limitations.

V. Thus far, we have considered only the plaintiff's case, and her theory of an equitable mortgage. In the original prayer of her petition she refers quite indefinitely to a trust. We turn now to the cross-petition to quiet title. Plaintiff contends that defendants' case is based on a conveyance made to defraud creditors, which, as between the parties, is unassailable, and that the cross-petition, therefore, on defendants' theory, cannot be maintained.

At this point we may say that the answer alleges that, about August 3, 1925, plaintiff instituted in the municipal court an action of forcible entry and detainer, to recover possession of these premises; that the cause was tried upon the merits, and judgment rendered in favor of defendants and against plaintiff, determining that plaintiff was not entitled to possession. This is admitted by the reply. It does not appear, nor is it claimed, that title was put in issue; but the judgment would be conclusive against plaintiff's right to possession.

Plaintiff and her grantors have never been in possession. Defendants and their grantors have always been in possession. The property is their home. Plaintiff's asserted claim to the property does not rest upon any asserted fraud intended by Tullises, but upon an equitable mortgage. The original beneficial and equitable interest of A. L. Tullis is admitted.

The legal action which was the immediate cause of having the deed made out to Johnson was a criminal one. It does not appear that the Tullises were under any civil liability, or that they had any creditors. They acted under the advice of an attorney, out of fear that a civil suit might be brought. It is not shown that any such suit ever was brought, or that there was ever in fact any creditor who was or might be defrauded. In this situation, we are of the opinion that the rule invoked by plaintiff is not applicable. See *Day v. Lown,* 51 Iowa 364; *Kervick v. Mitchell,* 68 Iowa 273; 27 Corpus Juris 657.

Neither A. L. Tullis nor the defendants (barring from consideration the statute of uses) ever had legal title. That

was vested by the Davis deed in Peter Johnson, and has been transmitted to plaintiff. Defendants' claim to ownership necessarily assumes that the legal title vested in Johnson in trust for Tullis. Johnson originally was merely the depository of the legal title. The trust was wholly passive,—a dry trust. 26 Ruling Case Law 1173. The trustee, however, has advanced a great deal of money for the improvement and preservation of the corpus of the trust estate. Mrs. Tullis testifies that the $400 and the $150 were borrowed from her brother, the trustee, to build and finish the house. This money, on defendant's testimony, was borrowed of the trustee, and used by them for the express purpose of improving the property. Johnson must, on the record before us, have understood that he was loaning the money, and that it was used, for that purpose. The purpose was, therefore, mutual. The mechanic's lien paid by Mary Johnson was, in the foreclosure suit, conclusively determined to be a lien upon this particular property. The taxes and special assessments were liens. Tullis and wife asked for, received, and used the loans for the purpose of building the house which they and the other defendants have enjoyed, the legal title whereto the defendants now, in effect, are claiming to recover from Johnson's successor in interest. We think the record fairly shows that the parties must, in all these things, have dealt on the postulate of Johnson's possession of the legal title. The expenditures of Peter and Mary Johnson were not merely volunteered. Peter and Mary Johnson, in making the loans, and in paying the mechanic's lien and taxes, were not interlopers. Defendants now ask the court, sitting in equity, in effect to cancel, as to the plaintiff, the conveyance to Johnson which A. L. and Mary Tullis purposely caused to be executed, and ask the court to deny to Johnson and his successors any return or reimbursement for money which they, with Tullis's or defendants' procurement or consent, have expended in making the property the home which it now is, and in protecting and preserving it. The legal title is in plaintiff. Defendants claim the equitable title, and ask the intervention of a court of equity in effect to cancel the Johnson legal title and establish in them an equitable, and in effect also the legal,

title. They are asking equity. As a condition to their right to receive equity, they must do equity.

The pleadings and arguments do not call upon us to determine the precise equitable rights and relationships existing between the trustee and beneficiaries in such a trust. The trustee's right to reimbursement out of the corpus of the property for expenditures justifiably made is universally recognized. *Tuttle v. Independent Sch. Dist.*, 62 Iowa 422; 26 Ruling Case Law 1320. The payments made by the Johnsons and the proof thereof inhere in the subject-matter and scope of the litigation, and defendants have been fully heard on the equities in respect thereto.

For equity to actively interpose its decree quieting title in the defendants and against the plaintiff, denying to plaintiff all compensation for expenditures in improving and preserving the property is abhorrent, not only to a sense of natural justice, but to those fundamental principles upon which equity grants or withholds its peculiar remedies. *Harrison v. Sauerwein*, 70 Iowa 291; *Lindell v. Lindell*, 150 Minn. 295 (185 N. W. 929); 21 Corpus Juris 176; 1 Pomeroy's Equity Jurisprudence, Section 385 *et seq.* See, also, *King v. Bolt*, 151 Iowa 1, 6, and cases there distinguished.

The maxim cited is specifically applicable to suits to quiet title against those whose claims against the property are barred at law by the statute of limitations. *Bank of Alma v. Hamilton*, 85 Neb. 441 (123 N. W. 458, 133 Am. St. 676); *Love v. Park*, 95 Neb. 729 (146 N. W. 941).

As has been indicated, plaintiff's case is not based upon the right of a trustee to a lien for reimbursement. On the issues and evidence, equity may only grant the relief asked by defendants on condition of their doing equity. That condition is that on or before the first day of October, 1929, they pay or tender the $400 and $150 advanced for building the house, $259.95 advanced for paying the mechanic's lien, and all sums paid for taxes and special assessments, with interest computed upon all of these items from the respective dates of advancement at the statutory rate of 6 per cent.

We may add that adverse possession is pleaded, but as such is not argued, by defendants. We may say briefly that the doctrine has no application. The legal title was taken in

 Johnson by direction of the Tullises, with the purpose that Johnson should hold it for them indefinitely. There has been no demand for conveyance, or denial, express or implied, of Johnson's right to hold the legal title. We cannot assume that the making of loans and payment of mechanic's lien and taxes, all at the instance or with the acquiescence of the Tullises, were with a hostile purpose toward Johnson. Possession was amicable, not hostile; and until shortly before suit was brought, nothing had occurred to charge the Johnsons with notice of hostility. *McClenahan v. Stevenson*, 118 Iowa 106; *Austin v. Baxter*, 189 Iowa 138, 144; *McNamee v. Moreland*, 26 Iowa 96, 109; *Jordan v. Brown*, 56 Iowa 281, 285; *Boynton v. Salinger*, 147 Iowa 537, 547; *Kirk v. Smith*, 9 Wheat. (U. S.) * 241 (6 L. Ed. 81).

The decree will be modified accordingly, and as so modified, is affirmed.—*Modified and affirmed.*

STEVENS, C. J., and DE GRAFF, ALBERT, and WAGNER, JJ., concur.