# DEARMAN v. DEARMAN AND COFFMAN.

1. A father and son join in a conveyance of slaves, the property of the son, to another son, with an understanding that the transferee should hold the slaves during his life, or until the children of the father come of age, and then to be divided among those children. The conveyance was made from the apprehension that the creditors of the father, who had once owned the property, would sieze it for his debts—Held, that if the slaves were not liable for the debts of the father, such an agreement, though it might be suspicious, would not necessarily be fraudulent.

2. The administratrix of the transferee having divided the slaves according to the agreement, and delivered them to those entitled, a part of whom were left with her to assist in gathering the crop, and which she afterwards refused to deliver, in an action against her for the recovery of the slaves—Held, that if the original agreement to divide the slaves was fraudulent, the division made by her was void; but if the agreement was *bona fide*, the division was good, as she was merely doing voluntarily what a Court of Chancery would have compelled her to do.

3. An administratrix cannot dispose of the property of the estate by *private* sale, and such a sale, though for a full consideration, will be void as against heirs, distributees and creditors.

Error to the Circuit Court of Sumter.

Trover by the plaintiff against the defendants in error for two slaves.

The plaintiff, William Dearman proved on the trial, that his father, one Jonathan Dearman, gave him, in 1812, in exchange for another negro, a negro woman named Lucy, the mother of the negro woman Dice, and grandmother of the boy Sidro, sued for in this action, both of whom were born after the exchange —that plaintiff and his father lived together until about the year 1818, when they removed to Florida, carrying with them the negro woman Lucy and her children—that the slaves remained in Florida, in possession of plaintiff, his father and himself still residing together, until the year 1830, when, the the plaintiff manifesting a desire that Solomon Dearman, a brother of the plaintiff, and then husband of the defendant, Anna Dearman, should bring the slaves to Alabama, but fearing that they might, if brought to Alabama, be seized as the

property of Jonathan Dearman, who was in embarrassed circumstances, he conveyed the slaves to Solomon by an instrument in writing; it being understood at the time that Solomon was to retain the possession of the slaves until his death, or until the coming of age of all the children of Jon. Dearman, when the slaves were to be divided between them equally. That upon this arrangement being made, the slaves were removed from Florida in the spring of 1832, and in the fall of that year Solomon removed his family to Sumter county, and took possession of the slaves, and retained them until his death, in July, 1838, that defendant, upon the death of her husband, administered on his estate, having the slaves in her possession, and returned them to the Orphans' Court as part of his estate.

The plaintiff also proved that shortly after she so administered, she consented and agreed with one Thomas Dearman another brother of the plaintiff, and Solomon, that the slaves should be divided according to the agreement previously mentioned, and that three persons were selected to make the division, who accordingly met, and all those interested being present, made an equal division of all the slaves among the children of Jonathan Dearman and the defendant. That the slaves were delivered severally to those to whom they were assigned, and the slaves sued for in this action were assigned and delivered to the plaintiffs, who then consented that they might remain for the purpose of assisting to get out the crop then growing on the plantation of the deceased—that defendant expressed herself satisfied with the division of the slaves, and admitted she had done wrong in retaining the slaves as part of the estate of the deceased. It was also proved that Solomon, in his lifetime, had refused to sell one of the slaves so divided, admitting that he could not make a good title without the consent of the children of Jonathan.

The defendant proved that Thomas Dearman came to the house of deceased and threatened to carry off all the slaves, and that after some altercation she agreed to the division. The defendant also produced a bill of sale from the plaintiff and Jonathan Dearman to the deceased, for all the slaves, dated 9th September, 1830, which was without condition and recited the consideration of thirteen hundred dollars. The defendant also proved that shortly after the bill of sale was made

the plaintiff admitted he had sold his negroes to Solomon Dearman for thirteen hundred dollars and a horse he was then riding, worth two hundred dollars, and that the money had all been paid, that he sold the negroes because they were a burthen to him, and he could do better with the money.

Upon this evidence the Court charged the jury, that unless the division of the slaves was founded upon a valuable consideration, it was void, and that they should so consider it—to which the plaintiff excepted.

Judgment was rendered for the defendants, and the plaintiff now assigns for error the charge of the Court.

J. B. CLARK, for plaintiff in error, argued that the charge was erroneous, that it referred to the jury to determine what was a valuable consideration, and that there must be a valuable consideration to sustain the division.  [16 Mass. 427; Chitty on Con. 10; 1 Bibb, 160.]

He maintained that no consideration at all was necessary, as the division was consummated by a delivery.  [2 Bl. Com. 441, 443; 24th Pickering, 261.]

SMITH and JONES, contra, insisted that there was no consideration whatever to support the division.

That the slaves were held by the defendant as administratrix, and that the division was a breach of her trust, which, being known to the plaintiff, he could acquire no right under it.  The statute points out the only mode by which an administratrix can sell.  [10 Peters, 161.]

ORMOND, J.—The bill of exceptions found in the record contains a great deal of superfluous matter—the material facts may be thus shortly stated:

The two slaves in dispute, with some others, were, by a bill of sale executed in Florida, in 1830, by Jonathan Dearman, the father, and the plaintiff William, his son, conveyed to Solomon, another son, and husband of the defendant, Anna Dearman, upon the consideration, as expressed in the bill of sale, of thirteen hundred dollars.  It further appears, that at the time of the conveyance there was a parol agreement that Solomon should retain possession of the slaves until his death, or

until all the children of his father, Jonathan, came of age, when the slaves were to be equally divided among the children of Jonathan. Evidence was offered conducing to show that the slaves were brought to Alabama, and the conveyance made to Solomon, that he might be able to protect them if seized as the property of Jonathan, the father, although it appears that the title to the slaves was in William, having been acquired by him by exchange with his father as far back as 1812. It does not appear that the consideration was paid, except by the acknowledgement of William.

The negroes were sent to Alabama in the spring of 1832, and Solomon followed and took possession in the fall of that year, and retained possession until 1838, when he died, and the defendant, Anna Dearman, administered and returned the slaves to the County Court, as the property of the estate.

Some time after, the brothers of the deceased claimed a division of the slaves, which, after some altercation was agreed to by the administratrix, and a division made, and the slaves delivered, the two sued for in this action being assigned to the plaintiff, who suffered them to remain to assist in getting out the crop. The administratrix afterwards refused to deliver them, and this action is brought for their recovery.

It is insisted that this was a combination between the brothers to delay, hinder and defraud the creditors of Jonathan Dearman, and that no right can be derived from so impure a source which can be enforced in a Court of law. If it be true that the sale to Solomon was merely colorable, and made with the intent supposed, although it would be utterly void as to those designed to be defrauded by it, it was binding on the parties to the agreement, and all claiming through them, and Solomon took the property discharged from the performance of the illegal condition.

If, however, the slaves were not bound for the *debts of Jonathan Dearman*, the father, although some apprehension might be felt by the family, that as he had once owned them, they might be subjected to the payment of his debts, or, in the language of the bill of exceptions, be "seized for the payment of his debts," the agreement to invest Solomon with the title to prevent this result would not be fraudulent; because, on this hypothesis, the property was not subject to the payment of

Jonathan's debts, and therefore a contrivance to prevent that result, though it might throw suspicion over the whole transaction, could not be a fraud on the creditors of Jonathan.

On the supposition that the transaction was *bona fide*, Solomon took the slaves charged with a trust, that on his death, or on the children of Jonathan Dearman coming of age, they should be equally divided between the children of Jonathan. This trust a Court of Chancery would have enforced and the administratrix might have carried into effect, as there can be no possible objection to her doing that voluntarily, which a Court of Chancery would have compelled her to do.

Although if the sale had been a fraudulent contrivance, Solomon would have taken the property discharged from the performance of the illegal condition as already stated. Yet, if he had executed the contract by dividing the slaves, it would have been binding on him. For although the law will not enforce a fraudulent executory contract, yet if it be *executed*, and the parties are in *pari delicto*, the law will not interfere between them. [Rochelle v. Harrison, 8 Porter, 352; Black & Manning v. Oliver, 1 Ala. Rep. N. S. 449.] But upon his death, without executing this contract, the property descended to his heirs at law, who were not, any more than their ancestor, bound to carry into effect this illegal condition. Nor could the legal representative of the deceased, by giving effect to an illegal contract, divest the title of the heirs at law, or defeat the rights of creditors.

To apply these principles to this case. The Court charged the jury, that unless the division of the slaves, with the assent of the defendant, among the children of Jonathan Dearman, was founded upon a valuable consideration it was void.

The objections to this charge, are, first, that it was not a charge upon the facts of the case. There was not only no evidence that a valuable consideration was given for the division of the slaves, but it is expressly shown that none was given— the charge therefore was entirely abstract.

Second—The charge supposes that if a valuable consideration had passed to the administratrix at the time of the division the title to the property would have passed. This is not the law. The statute declares that "it shall not be lawful for any executor, &c. to take the estate, or any part thereof, of any tes-

tator or intestate, at the appraised value, or to dispose of the same at private sale, except where the same is directed by the will of the testator. But in all cases where it may be necessary to sell the whole or any part of the personal estate of any testator or intestate, it shall be the duty of the executor, &c. to apply to the Orphans' Court of their county for an order of sale, and upon obtaining the same to advertise, &c., and to sell the same at public auction to the highest bidder, giving at least six months credit," &c. [Aik. Dig. 180, §13.]

It is unnecessary to inquire into the powers of executors at common law, not only because here administration was granted on the estate, but also because the whole subject is governed and controlled by the statute. We will not inquire whether some portions of the act regulating the sale of the estates of deceased persons may not be directory merely, because here the sale, (if indeed it can be called one,) was without any order of Court directing a sale to be made, and it was made *privately*. This the statute declares *unlawful*, and certainly no right can be derived from an unlawful act. The law is thus declared in a construction given to this particular clause in Ventriss v. Smith, [10 Peters, 161,] and it meets our entire approbation. If then there had been an actual sale made of the slaves in qustion to the plaintiff by the administratrix *privately*, and a full consideration paid, the title would not have passed as against the heirs, distributees or creditors. How far such an illegal sale would be binding on the executor, we need not inquire.

It may be said that if this is an error it is one in favor of the plaintiff in error, but it is manifest from this examination, that the case was not put to the jury on its merits, but was made to depend on the existence of a fact which was not only foreign to its merits, but which was not in evidence before the jury.

The Court should have instructed the jury to inquire, first, whether there was an actual sale of the property to Solomon, without condition, and if they found such to be the fact, they must find for the defendant. Second—if there was proof of an agreement at the time of the transfer of the slaves to Solomon, to divide the negroes at his death, or upon the arrival at age of the children of Jonathan, among those children, then to

inquire, upon the principles laid down in this opinion, whether that agreement was entered into in good faith, or with intent to delay, hinder or defraud the creditors of Jonathan Dearman, and that if they found the latter to be the fact, then they must find for the defendant. But if the agreement to divide the slaves was entered into in good faith, then the defendant, as administratrix, was justified in executing the contract; and if the slaves in controversy had been delivered to the plaintiff as · his share in the division, he was entitled to recover them in this action, notwithstanding they may have been left with the defendant to assist in gathering the crop.

Let the judgment be reversed and the cause remanded for another trial in conformity with this opinion.