The conclusions of fact in this cause when compounded with the pertinent equitable principles lead to a somewhat unique result.
On April 1st, 1926, the complainant and her husband, Robert C. Brown, acquired from Alfred Realty Corporation by purchase as tenants by the entirety, three lots in the Township of Princeton. On September 29th, 1932, they executed a bond conditioned for the payment of $4,800 to the defendant three years thereafter with semi-annual interest, and they concurrently executed a mortgage covering the three lots and the residence thereon to secure the performance of the bond. The mortgage was evidently recorded at 4:05 P.M. on the day of its execution. The complainant's husband, Robert C. Brown, died on July 24th, 1942. In the present bill filed on April 24th, 1945, the complainant declares her ownership of the property and charges that the bond and mortgage were not and have never been supported by any valid consideration and in fact were never delivered to the defendant. Wherefore the complainant prays that the mortgage be nullified. The defendant not only resists the allegations of the bill, but additionally interposes a counter-claim to foreclose the mortgage.
There are some incidental facts that in some degree illuminate the situation. Robert was the brother of Marion Rowland, the designated mortgagee. The relationship between the complainant and her sister-in-law, the defendant, at the time of the execution of the bond and mortgage is described *Page 464 
by the complainant as comparative with that "of two peas in a pod." No payment on account of interest or in reduction of the principal of the alleged mortgage debt has ever been made. No endeavor to collect interest or principal was manifested until the institution of this cause. Indeed it is not evident that the bond and mortgage were ever in the actual possession of the defendant.
The complainant with remarkable candor and frankness has testified that for some period immediately prior to 1932 her husband's business had not been remunerative and that he was being besieged by his creditors and in 1932, most vigorously by one in particular. She relates that the property at Princeton was then their residence and that due to the pressure of the economic decline, she and her husband resolved to place on record a second mortgage (the mortgage here implicated) which they contemplated would in effect emancipate that property from the apprehended claims of creditors. The complainant asserts that such was the sole object of the execution and recording of the mortgage, and that there was no other consideration. She now recalls that the scrivener of the instruments (before whom, incidentally, they were not executed) cautioned her and her husband that in such a pursuit they should "be careful whom you trust." Hence, it is said, the defendant was named as the obligee and mortgagee. The supposition was entertained by the complainant that the mortgage having fulfilled its intended purpose had been in some manner eradicated by her husband before his death. The complainant sought to convey one of the lots in 1945 and was then informed that the mortgage remained unsatisfied of record.
In Blaine v. Krysowaty, 135 N.J. Eq. 355; 38 Atl. Rep.
2d 859, I had occasion to state, with citations of the pertinent authorities: "It is a maxim of equity that he who comes into a court of equity must enter with clean hands, and in the ordinary application of that maxim a court of equity denies its remedies to a complainant who has been guilty of bad faith, fraud, or unconscionable acts in the transaction which constitutes the basis of his suit." *Page 465 
The familiar quotation in Hildebrand v. Willig, 64 N.J. Eq. 249
(at p. 259); 53 Atl. Rep. 1035, may be aptly repeated: "Courts of equity will not entertain propositions of this character. They say to all persons who desire to make conveyances with intent to defraud either present or possible future creditors: `You make such conveyances at your own risk; you cannot induce the courts to relieve you from the consequences of your fraudulent acts. It is no ground for relief that, although you intend to cheat creditors if occasion should require, the expected occasion did not happen, and your preparation to defraud creditors was therefore unnecessary.'"
In Semenowich v. Melnyk, 93 N.J. Eq. 615;117 Atl. Rep. 832, Mr. Justice Swayze pertinently remarked: "The rights of fraud-doers are not looked at in the light of the wrong they accomplish but of the wrong they plan."
Obviously, to now grant at the prayer of this complainant some affirmative relief to extricate her from her present involvement would plainly transgress the principle of equity jurisprudence to which reference is made, and also thwart the normal considerations of public policy in such cases.
It is also an ancient maxim that "in pari delicto, potior estconditis defendentis." The defendant, however, proceeded to introduce proofs to sustain the counter-claim. In that posture of the cause, the testimony of the complainant is not only relevant to her own cause of action, but is entitled to be accorded its defensive effect upon the counter-claim of the defendant. It is, of course, conceivable that in a covinous and collusive transaction, both the complainant and the defendant may encounter the same obstacles in their overtures for some form of affirmative assistance in a court of equity. Cf. Cartan v.Phelps, 89 N.J. Eq. 599; 105 Atl. Rep. 240.
In contemplating the merit of the counter-claim, it is not adequately evident that the bond and mortgage which the defendant now desires to enforce were ever delivered to her or to anyone on her behalf. The defendant as counter-claimant was unable to produce either of those instruments. *Page 466 
The bond is in the possession of the complainant. She discovered it among the papers retained by her husband at the time of his death. The incipient excursions of the mortgage are divulged, but its ultimate tangible destiny is acknowledged to be unknown. An authenticated copy of it as it remains of record is submitted.
The intent of the parties is an essential constituent of delivery. The recording of an instrument in some circumstances might well generate a presumption of delivery, while in other and different circumstances such a presumption does not arise.
The testimony reveals that George Brown was a brother of the mortgagor, Robert, and that he had some financial investment in Robert's failing business. It was to George that the mortgage was delivered immediately following its execution, and pursuant to the instructions of Robert, he hastened to present the mortgage at the office of the county clerk at Trenton with directions that the instrument be recorded and returned to him. Accordingly, the mortgage was duly recorded and returned to George, who thereupon surrendered it to his brother Robert.
In view of those circumstances I prefer to pursue the reasoning adopted by my learned colleague Vice-Chancellor Bigelow inBlachowski v. Blachowski, 135 N.J. Eq. 425; 39 Atl. Rep.
2d 94, and reject the notion that the occurrences as related manifested an intention by the mortgagor to deliver the instrument to the county clerk as the agent of the mortgagee and thus render it immediately effective.
An endeavor is exerted by the counter-claimant to establish a valid and substantial monetary consideration for the execution of the bond and mortgage supplementary to any prima facie
inference merely to be derived from the recitals therein. The testimony in that regard may be expediently blended in the following narrative. It is said that Eleanor K. Brown, the mother of Robert, George, and of the defendant and counter-claimant, Mrs. Rowland, many years ago lost her vision, and that it was orally agreed among the mother, her two sons, and daughter that the mother's financial resources should be placed at the absolute disposal of her daughter to *Page 467 
compensate the latter for the future care and maintenance of the mother. It is asserted by the defendant that her brother Robert was in need of funds in February, 1924, and that she loaned him $2,000 from their mother's savings account in the New Brunswick Savings Institution. An examination of the deposit book of that account discloses that the account was opened with a deposit of $700 on April 10th, 1918. Except for the allowance and entry of interest credits, the account was not augmented until February 14th, 1924, at which time a deposit of $2,000 is noted. Four days later, February 18th, 1924, the credit of $2,000 was withdrawn. This is represented to be evidential of the loan. Other than interest the only other credit is one of $100 deposited on May 7th, 1924. The account was closed on March 7th, 1927, by the withdrawal of a balance of $90. The defendant, Mrs. Rowland, did not reveal the source of the $2,000 deposit and does not now recall the circumstances surrounding the deposit and the manner and means by which the $2,000 was withdrawn from the account. Obscurity often impregnates the mind with doubts and conjectures.
And then, it is said that a mortgage held by the mother on the homestead farm in the sum of $1,500 was paid and satisfied in 1927, and that the proceeds of that mortgage were likewise loaned to Robert. These alleged loans aggregate $3,500. The mortgage purports to secure an indebtedness of $4,800. The defendant explains that many additional loans in smaller amounts were made to Robert from the savings account. Indeed, a niece testified that she made numerous trips to the bank where she procured moderate sums from the savings account and delivered them to her uncle Robert. Alas, I discover that there were only two withdrawals after 1924, one in the sum of $600 on April 12th, 1926, and the other in the amount of $90 extinguishing the account on March 7th, 1927. It will be well to now recall that the mortgage was executed and recorded on September 29th, 1932. The amount represented to be the mortgage debt was obviously an irrelative and evidently a fictitious figure.
Mrs. Rowland also imparted the information that at some time during the period of her brother's business anxiety, *Page 468 
Robert placed in her custody an envelope containing some "securities." She is unable to identify or vaguely describe the nature or value of the securities. Upon his request, she surrendered them to him. If the securities were intended to indemnify her against the loss of her alleged loans, it is singular that she has exhibited no diligence in having the bond and mortgage substituted for the securities so relinquished.
That the counter-claimant was aware of the financial jeopardy of Robert is conspicuous. Incidentally, my recollection of the evidence reminds me that her husband was employed during the emergent period by Robert as his bookkeeper at a wage of $15 a week.
In reorganizing the several segments of evidence in this cause, it seems possible to reconcile all of the factual circumstances and occurrences. The parties who were directly or indirectly involved were members of a family group. Manifestly Robert suffered a need of financial aid. Perhaps his mother with the cooperation of his brother and sister was disposed to rescue him. Robert's aspirations were to buttress his business and particularly to save his home against seizure by creditors. In the latter undertaking he availed himself of the expediency of the mortgage and the name of his sister as a compliant mortgagee in order to give a scrupulous aspect to his scheme. He cautiously retained personal possession of the bond and mortgage to await a crisis that apparently was averted. The principal of the mortgage was measured to fit the equity of redemption in excess of the primary mortgage. The mortgagors never confirmed the indebtedness by the payment of any interest or principal. And it is conceded that no claim for the recovery of the mortgage debt was ever asserted by the nominal mortgagee until the institution of this cause some thirteen years after the execution of the documents.
In such a posture of associated events, legal or equitable effectiveness cannot be accorded the bond and mortgage. The consequence is that both the bill and the counter-claim must be dismissed. *Page 469