MILDRED T. BISHOP
v.
CORY BISHOP, GEORGE T. KELLY III,
ETHEL MAY PRESSEY BELOW,
also known as ETHEL MAY BISHOP,
VIRGIN ISLANDS NATIONAL BANK,
and ETHEL MAY BISHOP, as Administratrix C.T.A. of the
ESTATE OF CORY BISHOP, Deceased
Appeal of Ethel May Bishop, Individually and as Administratrix
C.T.A. of the Estate of Cory Bishop, Deceased

No. 12431

United States Court of Appeals
Third Circuit

Argued January 28, 1958
Decided May 1, 1958
Rehearing Denied August 19, 1958*

*See, also, 257 F.2d 495*

*Certiorari denied 359 U.S. 914, 79 S. Ct. 578, 3 L. Ed. 2d 576.

655

CROXTON WILLIAMS, Charlotte Amalie, St. Thomas, Virgin Islands, *for appellant*

HARRY DREIS, Charlotte Amalie, St. Thomas, Virgin Islands, *for appellees*

Before MARIS, MAGRUDER and STALEY, *Circuit Judges*

MARIS, *Circuit Judge*

The defendant, Ethel May Bishop, widow of Cory Bishop and the administratrix c.t.a of his estate, appeals from the judgment of the District Court of the Virgin Islands cancelling a deed executed by Cory Bishop and the plaintiff, Mildred T. Bishop, which conveyed to George T. Kelly III, Trustee, their interests in 55 acres of real property located on the island of St. John and known as Catherine-

berg or Hammerfarm. To understand the nature of the questions which the appeal presents an account of the relations between the parties and the circumstances under which the controversy arose is necessary. From the uncontradicted evidence and the admissions in the pleadings the following facts appear:

Cornelius Comstock Below, who later called himself Cory Bishop, in 1925 married Ethel May Pressey, sometimes later known as Ethel May Bishop. A daughter, Rosemary, was born of the marriage. Cory deserted his wife and child in 1939. The latter were in Florida at the time and it appears that Cory sent them a letter from New York saying that he had failed them, that he was sorry, and enclosing a receipt for paid-up insurance. Thereafter Ethel May tried unsuccessfully to locate him and later was told that he was dead.

The plaintiff, Mildred T. Bishop, met Cory in New York City in 1938. She knew that he was a married man. Later he told her that his wife had left for Florida and that they were divorced. Cory then assumed the name "Cory Bishop" and Mildred testified that they were married by a justice of the peace in New York State in October, 1939. On July 19, 1940, they arrived in St. Thomas and opened a joint checking account under the names of Cory Bishop and Mildred T. Bishop in the Virgin Islands National Bank. Into their joint account were deposited their earnings, together with $1200 which Mildred received each year from her divorced husband, Wallace Bishop. On May 18, 1945, they purchased the property on the island of St. John known as Catherineberg or Hammerfarm. Four parcels of this property were sold by them during the ensuing years and about 55 acres were retained. They improved this land, purchased equipment and farmed it. Mildred took care of the gathering and marketing of the

farm produce and the income therefrom was deposited into their joint account.

In 1953 Cory organized a corporation, Antilles Enterprises, Inc., and Mildred during this period worked in the office with him at 8 Crystal Gade in St. Thomas. 800 to 900 acres of land belonging to them were conveyed to the corporation by deeds in which Mildred waived any dower rights. In 1954 and 1955 it appears that negotiations were in progress from the results of which Cory and his associates in the corporation hoped to realize very large sums of money.

In the fall of 1954 Cory and Mildred had personal difficulties and became estranged. They separated on December 25, 1954. Negotiations were then started by their counsel to effect an agreement for separation and support for Mildred. During the months of January and February, 1955, Cory paid Mildred $500 a month for her support. No formal agreement was arrived at, however.

In the meantime Ethel May had remarried in 1949, had been divorced three months later, and in 1952 had remarried again. After Cory's father died, his family in 1954 started a search for Cory and it was discovered that he was alive and residing in the Virgin Islands. Ethel May learned of this and gave the information to her attorney, George T. Kelly III, Esq., of Orlando, Florida. Mr. Kelly, under date of March 2, 1955, wrote to William W. Bailey, Esq., an attorney in St. Thomas, inquiring about Cornelius Comstock Below. Mr. Bailey answered, under date of March 11th, saying that he was unable to locate Cornelius, that the building at 8 Crystal Gade, the address given in Mr. Kelly's letter at which Cornelius was thought to reside, was occupied by a client of Mr. Bailey's law firm, and he asked for more helpful information. On March 14th Mr. Kelly advised Mr. Bailey that Cornelius was us-

ing the name Cory Bishop, to which Mr. Bailey replied on March 17th stating in part:

"Mr. Corey Bishop has been known to this firm for many years and is presently a valued client of this office. As a matter of fact, the day that I was investigating the whereabouts of Cornelius Comstock Below, prior to my letter of March 11th, I had occasion to talk with Mr. Corey Bishop who has an office and lives at No. 8 Crystal Gade and asked him if he knew a Cornelius Comstock Below, which he denied. Yesterday, Mr. Corey Bishop left for the States on a ten-day business trip, but it may be that my innocent conversation with him, which I have related above, may cause him to contact Mrs. June[1] Below, and we would appreciate being advised of this fact."

Cory did contact Ethel May in Florida on April 8, 1955. She testified that at this time he professed his love for her, asked for an opportunity to make up for the past sixteen years, and hoped that she would come to live with him. Shortly thereafter she divorced the man whom she had married in 1952. Cory said he would give her the 55 acres of land he owned with Mildred in the Virgin Islands, which Mildred would convey with him, that he held stock in Antilles Enterprises on which he expected to realize half a million dollars of which he would give Ethel May one-half, and that he had settled $5,000 on Mildred who had left St. Thomas for the States. He explained that he and Mildred had conveyed land prior to March 1, 1955 in the Virgin Islands and that Ethel May's waiver of her dower rights in that land was required[2] and he asked her to sign certain documents which he had brought with him, using the name "Ethel May Bishop". She did not sign any waivers at that time, however, but requested her attorney, Mr. Kelly, to go to the Virgin

[1] It appears from the evidence that Ethel May's nickname was "June".

[2] Under section 15, chapter 15, Title II, of the (1921) Code of St. Thomas and St. John (15 V.I.C. § 83 note), then in force, an instrument executed without the signature of the spouse conveyed only the interest of the one executing it and the grantee took subject to the dower or curtesy right of the one who did not join in executing the instrument.

Islands to investigate the situation. On April 14th, when Mr. Kelly was leaving Orlando for the Virgin Islands, Ethel May executed a power of attorney to him in which she gave him full power to act on her behalf, to transact every kind of business for her, to release any claim of dower or other claims of any kind she might have, to enter into agreements of any kind with her husband, Cory Bishop, and she granted Mr. Kelly full power and authority to "hold stock, real property or other property in his own name". To this document she affixed the signatures "Ethel May Below" and "Ethel May Bishop".

Mr. Kelly, Cory and Mr. Bailey, Cory's attorney, had arranged to meet in St. Thomas on April 15th and they conferred on that day and on the 16th. In the course of these conferences Mr. Bailey prepared the deed which Mildred now seeks to have set aside as invalid. That deed purported to convey the remaining 55 acres of the property known as Catherineberg or Hammerfarm, which Cory and Mildred owned in St. John, to Mr. Kelly as Trustee but did not declare the terms of trust or name the beneficiaries of the trust. Cory took this deed to Mildred in order to obtain her signature to it. As to what took place at this meeting between Cory and herself Mildred testified:

"He came to my apartment on the day of April 16th in a very terrible state. He was crying; he was terrible careless; he hit his head against the wall; he told me that I had apparently never been married to him. His wife had turned up. He was going to be in a terrible difficulty. He referred to the word 'blackmail'. He told me the only way to help him and to protect my interest would be for me to place it in trust — from what I understand, a trust is something that keeps things from people. I had no reason at that time to distrust Corey. He was in distress, and I felt that it was a terrible thing to have two wives, and I trusted him. . . .

\*　　\*　　\*

660

". . . he said that it was the only possible way to place this in trust so that his wife couldn't take my part of it.

* * *

". . . Corey came to me in a very, very upset state. He cried. His eyes were already red. He was most hysterical and he told me that he had — you know, not told me the truth; that the defendant had not divorced him, and that apparently I was never his wife. He said — you know — most awful things could be done to him, and so forth. Naturally, my interest was to help Corey. It always has been. He explained to me it was a trust in which Catherineberg, the farm was put. My interest, which I always had with him, my share of the interest which we had together in Catherineberg would then be protected, and that the defendant could not secure my property, and that was a trust that sounded logical to me. I saw a man whom I never met or heard the name of before, Mr. George Kelly, listed as Trustee. I'm not an attorney. I took it for granted. I always trusted Corey. I saw no reason not to — that this awful thing had befallen him. The first thing that he would protect me, and for my protection I would sign it. . . .

* * *

". . . It just merely says that Mr. Kelly — it seems to me, would hold in trust this farm for Corey and myself.

* * *

"I hadn't any idea who Mr. Kelly was. I found out the next day that Mr. Kelly was the defendant's attorney at the time —

* * *

"He had already told me that this was a dependable person, and in which we would put Catherineberg in trust, so that my share of it could be protected for me and would be out of reach of the defendant to touch.

* * *

". . . He was putting in trust in Mr. Kelly's name our farm for us — for both of us — that he explained putting in trust.

* * *

". . . I don't say that he used exactly those words — to protect our interest.

* * *

"Corey was about to have a very large business organization

661

and it isn't considered proper to have two wives at the same time, and all of this was to protect me, and make it possible for him to remain — retain his position and to pay the defendant. He said she was demanding money."

At the meeting which she thus described Mildred signed the deed and it was duly acknowledged, delivered and recorded. Cory left the Virgin Islands shortly thereafter and never returned. Several letters from Mildred to Cory and one from Cory to Mildred subsequent to April 16th which were offered in evidence, indicate that their relations were friendly at the time he departed.

On April 26th Kelly executed a declaration of trust formally declaring that he held the property in St. John and 10 shares of stock of Antilles Enterprises which Cory had also assigned to him, in trust for Ethel May for life with remainder to her daughter, Rosemary.

On April 29th a reconciliation agreement was entered into between Cory and Ethel May by which he conveyed to her a one-half interest in all his property with the exception of the stock he held in Antilles Enterprises, this conveyance to be in addition to the land in St. John which he had previously conveyed, and the 10 shares of Antilles Enterprises which he had previously assigned, to Mr. Kelly as trustee. Ethel May thereby agreed to release all her dower rights in the property of her husband. On the same date Ethel May Bishop executed a release of her dower rights in any land situated in the Virgin Islands or elsewhere which had been conveyed by her husband, either individually or jointly, prior to March 1, 1955. This release was subsequently recorded in the Virgin Islands.

In July, 1955, Cory, Ethel May, their daughter, Rosemary Fallonstein, and her husband, Leo Fallonstein, joined in executing an instrument entitled "Revocation of Trust, Conveyance and Assignment to Ethel May Bishop", which terminated the trust which Mr. Kelly had declared in

favor of Ethel May for life with remainder to her daughter, discharged the trustee and conveyed the entire title to the trust property to Ethel May in fee simple, free of said trust.

Ethel May arrived in the Virgin Islands some time in 1956, claimed the land in St. John, and occupied it. On June 25, 1956, Mildred instituted the present suit against Cory, Mr. Kelly and Ethel May alleging, inter alia, that Cory on April 16, 1955 told her he was in great difficulty and represented that she was in great danger of losing her interest in the property and that he intended to protect her and save himself from great financial harm by putting the property in trust for her, and that she had the utmost trust and confidence in him and was thereby induced to sign the deed in which Mr. Kelly was designated to hold the property as trustee. She claimed that the representations made by Cory were false and were made with intent to defraud her. She accordingly asked the District Court to cancel the deed of April 16, 1955, as well as two other instruments, the declaration of trust made by Mr. Kelly on April 26, 1955, and the revocation of the trust executed in July, 1955. In an amended complaint she also sought partition of the property.

Ethel May filed an answer alleging that the complaint failed to state a cause of action against her. Cory filed an answer on September 13, 1956 admitting that Mildred had acquired the land in question with him and that he had terminated the trust. All other allegations he neither admitted nor denied. Cory died by his own hand four days later and Ethel May, as the administratrix c.t.a. of his estate, was substituted as party defendant. The Virgin Islands National Bank, holder of a mortgage on the property here involved, was added as a party defendant.

Following the trial of the case at which the foregoing facts appeared the District Court found that Cory, Mr.

Kelly and Ethel May were all guilty of a fraud upon Mildred in inducing her to sign the deed in question. A judgment was entered declaring, inter alia, the deed of April 16, 1955 null and void insofar as it purported to convey Mildred's undivided one-half interest in the land in question and decreeing that Mildred was entitled to partition of the property. The court further declared the Revocation of Trust, Conveyance and Assignment to Ethel May Bishop to be null and void insofar as it purported to convey to her Mildred's one-half interest in the land (3 V.I. 250), 152 F. Supp. 4. This appeal by Ethel May, individually, and as Administratrix c.t.a. of the Estate of Cory Bishop, followed.[3]

In considering this appeal we are met at the outset with the question whether under the facts of this case Mildred may invoke the aid of the courts to secure the equitable relief which she seeks.

 It is an ancient and established maxim of equity jurisprudence that he who comes into equity must come with clean hands. If a party seeks relief in equity, he must be able to show that on his part there has been honesty and fair dealing. Wheeler v. Sage, 1863, 1 Wall. 518, 68 U.S. 518, 529, 17 L. Ed. 646. Equity will not ordinarily aid a person to secure relief from a situation which results from the conveyance of his property in fraud of creditors or other persons claiming it. Dent v. Ferguson, 1889, 132 U.S. 50, 64-66, 10 S. Ct. 13, 33 L. Ed. 242; De Matteo v. Flanigan, 1943, 134 N.J. Eq. 198, 34 A.2d 744; 19 Am. Jur., Equity §§ 469, 472. Moreover, the unconscionable character of a transaction need not be pleaded or set up as a defense. Whenever it is disclosed the court will of its own motion apply the maxim. Frank Adam Elec-

[3] On March 28, 1957 the District Court granted Mildred leave to amend her complaint and add thereto a claim to her interest in certain property purchased by Cory and herself to equip the farm. No relief was granted by the judgment with respect to this property, however, and no question is raised on appeal as to it.

tric Co. v. Westinghouse Elec. & Mfg. Co., 8 Cir., 1945, 146 F.2d 165; Gluck v. Rynda Development Co., 1926, 99 N.J. Eq. 788, 134 Atl. 363, affirmed 100 N.J. Eq. 554, 135 Atl. 917; 30 C.J.S. Equity § 97. In Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 1945, 324 U.S. 806, at pages 814-815, 65 S. Ct. 993, at page 997, 89 L. Ed. 1381, the Supreme Court said:

"The guiding doctrine in this case is the equitable maxim that 'he who comes into equity must come with clean hands.' This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. This presupposes a refusal on its part to be 'the abettor of iniquity.' Bein v. Heath, 6 How. 228, 247, 12 L. Ed. 416. Thus while 'equity does not demand that its suitors shall have led blameless lives,' Loughran v. Loughran, 292 U.S. 216, 229, 54 S. Ct. 684, 689, 78 L. Ed. 1219, as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue. Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 245, 54 S. Ct. 146, 147, 78 L. Ed. 293; Johnson v. Yellow Cab Transit Co., 321 U.S. 383, 387, 64 S. Ct. 622, 624, 88 L. Ed. 814; 2 Pomeroy, Equity Jurisprudence (5th Ed.) §§ 379–399.

"This maxim necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant. It is 'not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion.' Keystone Driller Co. v. General Excavator Co., supra, 290 U.S. 245, 246, 54 S. Ct. 147, 148, 78 L. Ed. 293. Accordingly one's misconduct need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character. Any wilful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim by the chancellor."

Turning to the facts of this case it will be seen from Mildred's own testimony as to what took place between

Cory and herself that she signed the deed in question with the intention of putting title to the property in a secret trust in order to prevent Ethel May from obtaining the property. She testified: "He told me the only way to help him and to protect my interest would be for me to place it in trust — from what I understand, a trust is something that keeps things from people." Thus the deed was signed by her in circumstances which were far from honest and for the express purpose, as she thought, of defrauding Ethel May of property in which she was entitled to claim an interest. For it is obvious that Mildred thought that the way to help Cory was to defeat the claims of his wife, Ethel May, by conveying his property to a trustee to hold upon an undisclosed trust. And it is equally clear from her testimony that she thought that Ethel May might have some sort of a claim to her own share of the property and that this also could be frustrated by the conveyance to the trustee. Otherwise Mildred, admittedly an experienced businesswoman, certainly would not have thought it necessary to carry through the devious procedure of attempting to conceal the ownership of herself and Cory by a conveyance of the property to a trustee upon an undisclosed trust.

■ ■ The fact that Cory misrepresented to Mildred the purpose of the conveyance did not lessen her intent to defraud Ethel May of property to which she may have been entitled, but merely frustrated the successful consummation of her intended object. And it is the moral intent of a person in such a case as this, rather than any actual injury done, which determines whether he has come into court with clean hands. Hildebrand v. Willig, 1903, 64 N.J. Eq. 249, 53 Atl. 1035; Coleman v. Coleman, 1936, 48 Ariz. 337, 61 P.2d 441, 106 A.L.R. 1309; 19 Am. Jur., Equity § 476. Here Mildred's intent to defraud Ethel May is plain, if her own testimony is to be believed. And

if it is not to be believed and the fact is that she knew that the deed which she signed was to be for the benefit of Ethel May and she signed it at Cory's request in order to help him out of his desperate predicament, the result is the same. In either case she is not entitled to the assistance of a court of equity to strike down the conveyance.

This result would follow even if Ethel May had herself also been guilty of fraud as the District Court found. For in such a case equity will leave the parties where it finds them. Blystone v. Blystone, 1865, 51 Pa. 373, 376; Gill v. Henry, 1880, 95 Pa. 388; In re Simon's Estate, 1902, 20 Pa. Super. 450; Brown v. Rowland, 1946, 137 N.J. Eq. 462, 45 A.2d 592, affirmed 141 N.J. Eq. 358, 57 A.2d 246; 19 Am. Jur., Equity § 478; 30 C.J.S. Equity § 94. But we do not have such a case here. On the contrary there is no evidence in the record to support the finding of the District Court that Ethel May or her lawyer, Mr. Kelly, participated in any way in the fraud which Mildred asserts was practiced upon her by Cory in inducing her to sign the deed in question on the strength of misrepresentations as to its purpose. Those findings accordingly cannot stand in any event. This is not to say that we do not fully agree with the finding of the District Court that "Cory Bishop's actions throughout show that he never intended to be fair with either of these two women, and that he betrayed either of them where it suited his purposes." All the relevant evidence supports that finding. But as to Ethel May the evidence is entirely consistent with the fact that she, a wife deserted and unsupported for 16 years, and her lawyer, Mr. Kelly, were seeking to secure redress from Cory for his long continued desertion and nonsupport as well as some tangible consideration for the release of her dower rights which he was pressing her to sign in order to clear the title to

the land which he had previously conveyed to Antilles Enterprises, Inc. and others.

We conclude for the reasons stated that the District Court erred in not dismissing the complaint. We, therefore, do not reach the other questions which the District Court considered and which the parties have discussed on this appeal.

The judgment of the District Court will be reversed and the cause will be remanded to that court with directions to dismiss the complaint.

On Petition for Rehearing

Before BIGGS, *Chief Judge*, and MARIS, MAGRUDER, STALEY and HASTIE, *Circuit Judges*

PER CURIAM

■ A petition for rehearing has been filed which vigorously assails the opinion of the court. We have given careful consideration to the petition but are satisfied that it presents nothing which was not fully considered and, in the view of the judges who heard and decided the appeal, correctly decided by the court. For this reason and because four circuit judges have not requested rehearing in banc the petition for rehearing will be denied.

BIGGS, *Chief Judge* (dissenting)

My views in this case differ substantially from those of my colleagues:

(1) *As to Fraud*: There is ample evidence in the record to sustain the conclusion of the court below that Cory Bishop (Cornelius Below) induced Mildred Bishop by fraud to sign the deed naming Kelly, Ethel Bishop's attorney, as "trustee", and that Kelly was a party thereto, Mildred Bishop not knowing that Kelly was Ethel Bishop's lawyer. D.C.V.I. 1957 (3 V.I. 250), 152 F. Supp. 4, 7-8. The fraud of an agent or attorney is imputable to his principal. The obvious reason, as the court below found,

668

for not including the cestui's name in the "trust" deed was that Mildred Bishop would not have signed the deed had she known that it was for the benefit of Ethel Bishop.

Mildred Bishop owned Hammerfarm with Corey Bishop as a tenant-in-common. She had paid a substantial part of the purchase price. The court below so found and there is no substantial evidence to the contrary. Mildred Bishop believed that her interest in the property was in jeopardy and that if the property were put in Kelly's hands as "trustee" both her interest and that of Corey would be protected from Ethel Bishop. The portions of Mildred Bishop's testimony quoted in the opinion of this court bear out this view and I think the emphasis laid in the opinion on but two of the many phrases used by Mildred Bishop, viz., "a trust is something that keeps things from people", and "to protect our interest", cannot adequately support the conclusion drawn by this court that Mildred Bishop executed the deed to deprive Ethel Bishop of her dower right.

There is no evidence that Mildred Bishop executed the deed to Kelly to deprive Ethel Bishop of her dower right.[1] There is no substantial evidence of fraudulent intent on Mildred Bishop's part. Mildred Bishop's testimony considered as a whole, indicates that she was endeavoring to protect her own interest in the real estate.

The court below had both Mildred Bishop and Ethel Bishop before it. It had the opportunity to weigh their credibility. The question of Mildred Bishop's intent in executing the deed is a question of fact and this court has made its own finding in derogation of Rule 52(a), Fed. R. Civ. Proc., 28 U.S.C. [App]. A court of appeals is not a fact finding body.

Conceding that an ultimate conclusion of legal fraud

[1] If, as was indeed the fact, Ethel Bishop was Corey Bishop's wife, the deed could not have deprived her of her dower right.

presents a mixed issue of law and fact, here the finding of fact on which an ultimate conclusion of legal fraud would have had to be bottomed was not made by the court below. But even if this were not so I think it is clear that this court has abused legal discretion in overruling the conclusions of the District Court. These conclusions find overwhelming support in the evidence. That Mildred Bishop under all the circumstances would knowingly have conveyed her interest in Hammerfarm to Ethel Bishop strains credulity.

(2) *As to the Clean Hands Doctrine.* Assuming arguendo that this court is correct in its conclusions in respect to the issue of fraud referred to at "(1)," supra, nonetheless this court has incorrectly applied the clean hands doctrine. That doctrine is, of course, that where a conveyance of property has been executed with the purpose of defrauding creditors or others the grantor cannot attack the conveyance or obtain relief against it in a court of equity. But it is also the law that where a property owner conveys land to protect it against an alleged claim, where there is neither claimant nor legal claim, the doctrine does not apply. The record shows that no claim was made by Ethel Bishop as to Mildred Bishop's property and it is astonishing that in the complete absence of this operative fact this court nonetheless obliterates Mildred Bishop's own interest as a tenant-in-common in Hammerfarm. Ethel Bishop's dower right did not attach and could not have attached to Mildred's Bishop's interest in the real estate held by her as a tenant-in-common with Corey.[2]

[2]It should be noted again that the property involved in this litigation was held by Mildred Bishop and Corey Bishop as tenants-in-common. While the characteristic attribute of a tenancy in common is a unity of possession, each share still constitutes a distinct estate. Thus while a claimant against a tenant-in-common can reach the particular debtor's interest in the co-tenancy, and thus may become a tenant-in-common with the debtor's co-tenants, or may cause a partition of the estate he cannot deprive the co-tenants of their property rights. Hay v. Crawford, 1945, 159 Kan.

Most important of all the Virgin Islands Code specifically provides, vol. I, Title 1, section 4, "The rules of the Common Law, as expressed in the restatements of the law approved by the American Law Institute, and to the extent not so expressed, as generally understood and applied in the United States, shall be the rules of decision in the courts of the Virgin Islands in cases to which they apply, in the absence of local laws to the contrary." While the Virgin Islands Code of 1957 was not in effect at the time of the happening of the events complained of in the case at bar nonetheless this court in Callwood v. Virgin Islands Nat. Bank, 3 Cir., 1953 (3 V.I. 540), 221 F.2d 770, had already ruled that the decisional law of the Virgin Islands in case there was no applicable statute or ordinance was that embodied in the common law as expressed by the Restatements. There is no substantial difference between the common law as incorporated in the Restatements and the common law of England as adopted and understood in the United States. See Davies v. Otty, 35 Beav. 208 (Eng. 1865); 1 Scott, Trusts § 63, pp. 569-570 (2d ed. 1956).[3]

723, 158 P.2d 463, 159 A.L.R. 388; Altobelli v. Montesi, 1938, 300 Mass. 396, 15 N.E.2d 463; Rostan v. Huggins, 1939, 216 N.C. 386, 5 S.E.2d 162, 126 A.L.R. 410; Koubek v. Tenos, 1941, 343 Pa. 409, 22 A.2d 740.

[3]See also Dearman v. Dearman, 1842, 4 Ala. 521; Berniker v. Berniker, Cal. App. 1946, 174 P.2d 668, affirmed 1947, 30 Cal. 2d 439, 182 P.2d 557; Vollaro v. Gargano, 1922, 97 Conn. 275, 116 A. 179; Rossow v. Peters, 1917, 277 Ill. 436, 115 N.E. 524; Warner v. Tullis, 1928, 206 Iowa 680, 218 N.W. 575; Hoff v. Hoff, 1920, 106 Kan. 542, 189 Pac. 613; Greffin's Ex'r v. Lopez, 1817, 5 Mart., O.S., La., 145; Zak v. Zak, 1940, 305 Mass. 194, 25 N.E.2d 169; Bloomingdale v. Chittenden, 1889, 74 Mich. 698, 42 N.W. 166; Burns v. Burns, 1913, 124 Minn. 176, 144 N.W. 761; Cook v. Mason, 1945, 353 Mo. 993, 185 S.W.2d 793, 157 A.L.R. 942; Kidd v. Kidd, 1951, 210 Miss. 465, 49 So.2d 824; Thompson v. Steinkamp, 1947, 120 Mont. 475, 187 P.2d 1018; Cowles v. Cowles, 1911, 89 Neb. 327, 131 N.W. 738; Collins v. Schump, 1911, 16 N.M. 537, 120 Pac. 331; Tiedemann v. Tiedemann, 1922, 201 App. Div. 614, 194 N.Y.S. 782, affirmed without opinion, 1923, 236 N.Y. 534, 142 N.E. 273; Brady v. Ellison, 1804, 3 N.C. 348; Hickey v. Ross, 1946, 197 Okl. 543, 172 P.2d 771; Hanscom v. Hanscom, 1949, 186 Or. 541, 208 P.2d 330; Rivera v. White, 1901, 94 Tex. 538, 63 S.W. 125; Abslag v. Bock, 1926, 139 Wash. 198, 246 Pac. 300; Wilcoxon v. Carrier, 1949, 132 W.Va. 637, 53 S.E.2d 620.

The Restatement, Trusts, commenting on section 63, pp. 200-201, provides:

"[I]f the owner of a piece of land transfers it to another who agrees to hold it in trust for the transferor, and the purpose of the transferor in making the transfer was to prevent a judgment creditor from levying execution upon the land, the transferor can compel the transferee to reconvey the land if it was a homestead of the transferor's upon which the creditor could not have levied execution."

The Restatement aside, the great weight of authority is to the same effect.

Professor Austin Scott points out that while the settlor's state of mind in a case in which he attempts to defeat a creditor's claim is as bad as though the claim were enforceable, nonetheless the refusal of a remedy to the settlor under such circumstances operates to cause a forfeiture of property disproportionate to the degree of his wickedness and the extent of harm done by him. 1 Scott, Trusts § 63, pp. 569-570 (2d ed. 1956).

Professor Scott also shows that courts have been too ready to deny relief to the settlor without consideration of the injustice which results. He states, "There is no doubt that as between the parties it is more just to require the trustee to surrender the property to the settlor than to permit the trustee to keep it." 3 Scott, Trusts § 422, p. 2196 (1939 ed.). See also Wantulok v. Wantulok, 1950, 67 Wyo. 22, 214 P.2d 477, rehearing denied 223 P.2d 1030, 21 A.L.R.2d 572; Thompson v. Steinkamp, 1947, 120 Mont. 475, 187 P.2d 1018; Note, 44 Yale L.J. 173.

I think it is clear that when the Restatements of Trusts and Restitution were compiled, the American Law Institute adopted the principle of those decisions which precluded the forfeiture of the property of a transferor who attempted to prevent a person from enforcing a claim against the transferred property when the claim was

non-existent or could not have been enforced against the property. In such cases the Restatement either allows the settlor to enforce the trust, Restatement, Trusts § 63, comment b to subsection (1), or, if the trust fails, to compel the trustee to reconvey the property to him. Restatement, Trusts § 422, comment *c*. See also, Restatement, Restitution § 140 and 4 Scott, Trusts § 422 (2d ed. 1956). [4],[5]

(3) *No Valid Trust*. The so-called "trust" deed did not state the terms of the trust or name or describe a beneficiary. Ethel Bishop contended that the reason the cestui was not named was because she could not decide to use the name "Below" or the name "Bishop". A more obvious reason, as has been pointed out, suggests itself. But it is black letter law that a trust, other than one which is charitable or honorary, cannot be created in favor of a person who is not named in the trust deed, and that in such a case the express trust will fail and a resulting trust will arise immediately in favor of the settlor. 2 Scott, Trusts § 112 (2d ed. 1956).

The court's opinion therefore presents the anomaly of a court of equity employing the clean hands doctrine to preclude an attack on a fatally defective trust deed, one completely lacking in equity. This court permits an invalid trust to subsist and to work a forfeiture of the settlor's property and a windfall to a third party.

(4) *Conclusions*. The ruling of the court would seem

[4]Corbin refers to the spectacle of another's unjust enrichment as perverting the unclean hands doctrine. 6 Corbin, Contracts § 1463, p. 828 (1951). Mr. Justice Black in Johnson v. Yellow Cab Transit Co., 1943, 321 U.S. 383, 387, 64 S. Ct. 622, 88 L. Ed. 814, said: "The maxim that he who comes into equity must come with clean hands is not applied by way of punishment for an unclean litigant but 'upon considerations that made for the advancement of right and justice.' Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 245, 54 S. Ct. 146, 78 L. Ed. 293. It is not a rigid formula which 'trammels the free and just exercise of discretion.' "

[5]In conclusion upon this phase of the case I point out that but small emphasis was placed on the clean hands doctrine in the court below and there is but cursory reference to it in the briefs of the parties on appeal.

■■■

to err in three major areas and dislocate general legal principles and also the law of the Virgin Islands as heretofore carefully established by this very court. In my opinion there are special and important reasons why the decision of the Court should not stand. Accordingly I dissent from the order denying rehearing.

Judge HASTIE also dissents and joins in so much of this opinion as concerns the application of the doctrine of clean hands.