Argued May 3; reversed, decree rendered July 6, 1949

# HANSCOM *v.* IRWIN
208 P. 2d 330

*Junius V. Ohmart,* of Portland, argued the cause and filed a brief for Appellant.

*Paul C. King,* of Portland, argued the cause for Respondent June Hanscom. With him on the brief was Alfred P. Kelley, of Portland.

*Elmer Johnson,* of Portland, argued the cause for Respondent, Inez Irwin. On the brief was John D. Williams, of Portland.

Before LUSK, Chief Justice, and BRAND, ROSSMAN and BAILEY, Justices.

LUSK, C. J.

Joe Hanscom, father of the plaintiff, died in 1928. By his will he devised to his son, William Hanscom, the land involved in this suit subject to a life estate in his widow. On May 20, 1930, while the estate of Joe Hanscom was still in course of probate the plaintiff excuted a general warranty deed purporting to convey to his then wife, the defendant, Inez Irwin, the South-*west* quarter of Section Fourteen, in Township Four North Range Thirty-two East of the Willamette Meridian in Umatilla County, Oregon. The deed was re-

corded on the same day that it was executed. The description in the deed was erroneous, as the plaintiff's land was the South*east* quarter of Section Fourteen while the South*west* quarter belonged to his sister. It is not questioned, however, that he intended to convey his own land. Hanscom testified, in effect, that his purpose in executing the deed was to prevent the land from becoming subject to the lien of a possible attachment or judgment based upon his obligation upon a bond which he, with others, had signed to insure the appearance in court of a man named Charlie Robinson. He swore that he talked the matter over with his wife, that she "thought it best if I turned it over to her", and that she agreed to reconvey the property to him as soon as as the obligation was settled.

Inez, on her part, denied all knowledge of this deed until the year 1935. She testified that she did not receive it, and there is no evidence that the deed was ever delivered to her. Her answer, however, admits "that plaintiff executed *and delivered* to her a deed of conveyance dated May 28, 1930." (Italics added.)

The Hanscoms lived in Portland. In 1935 Inez was visiting Hanscom's sister, Mrs. Furnish, in Pendleton, and Mrs. Furnish, according to Inez' testimony, told her of the error in the description in the 1930 deed and that the land therein described was the property of Mrs. Furnish. Her testimony about this is as follows:

"When I first remember this deed, it was called to my mind, I remember distinctly I was in Pendleton, Oregon. I was visiting Anna Furnish and she says, 'Do you know Will deeded you the wrong land?' and I said, 'No. I didn't,' and she says, 'You better have Will have it changed and fixed right.' When I went back home, I went to Mr. Williams' office and I told him I had the wrong land deeded

to me and that I wished he would make a corrected deed, which he did.''

The plaintiff testified that Mrs. Furnish called the mistake to his attention and that he and his wife discussed the correction deed about a week or two before it was signed, and he told her he ''wanted a clause in there''—meaning a clause of reconveyance. The evidence is obscure as to which of them consulted Williams first, but, in any event, Mr. Williams prepared two deeds, one a quitclaim deed from Inez to Hanscom conveying the Southwest quarter of Section Fourteen and containing a recital that its purpose was to cancel the 1930 deed, the other a general warranty deed from Hanscom to Inez conveying the Southeast quarter of Section Fourteen. The consideration recited in the latter deed is ''One and no/100 dollars and other good and valuable consideration.'' The quitclaim deed was executed and acknowledged on March 16, 1935; the warranty deed was executed and acknowledged on March 18, 1935. Both deeds were recorded by Inez.

Mr. Williams was a friend of the Hanscoms and lived near them. Inez signed the quitclaim deed in his office, but Williams went to their home for the purpose of securing Hanscom's signature on the warranty deed. At that time, according to Hanscom's testimony, he told Williams that he wanted a clause in the deed to show that he could get the title back from Inez whenever he demanded it, and he informed Williams about his obligation on the Robinson bond. But Williams advised him, according to Hanscom's testimony, that such a clause would not be ''legal'', that ''You can get it back from your wife. You can get it back by law if she does refuse to turn it back.'' Mr. Williams, who represented the defendant, June Hanscom, at the trial,

took the stand and denied categorically and emphatically that Hanscom said anything to him or in his presence about his desire for a provision in the deed for reconveyance or about Hanscom's obligation on a bond, or that he had ever heard of such an obligation. Hanscom gave a somewhat different version of this matter in a pretrial deposition when he was examined by Mr. Williams. He then testified:

"Q Who gave John D. Williams the information to prepare the deed?

"A I think Inez.

"Q Did you give him any instructions?

"A No; only that the,—I wanted to make the stipulation on the deed that it would be,—the income would still,—if there was an income it would still be retained by me as long as I lived.

"Q Was that done?

"A No, because for the purpose it was given, why, it would'nt have been legal.

"Q What would have made it illegal?

"A Well, from what you said, that it would be best to just leave it that way without that, and we could have an agreement that she would turn it back to me some future date; that if I would put that clause in there that,—that the law,—that it wouldn't be held,—she couldn't hold it by law; and it was for her protection that I was making it,—for both of our protection.

"Q Were there some creditors at that time involved?

"A There was this one creditor, I understood; the creditor at that time I signed a bond, and it seems as though there was a suit filed against it and I was obligated, too, although I never did receive any papers, but I understood that there was that suit pending against it.

"Q Well, this deed was given, then, by you to

protect your wife against creditors or protect you
against creditors?

"A Protect me until I could,—against this one
obligation until I could get straightened around to
find out if I was really obligated to him."

At this time, it is conceded, the Hanscoms were hav-
ing domestic difficulties. Within less than four months
Inez left him, and in December, 1936, she divorced him.
Notwithstanding the divorce they remained on friendly
terms and saw each other occasionally. And it is
Hanscom's testimony that more than once he asked her
to reconvey the property to him and that she promised
to do so but never kept her promise.

In October, 1941, Inez married Clay Monroe. (She
divorced him in May, 1942, and married her present
husband in 1943.) In the meantime there had been no
change in the record title. In December, 1941, the
plaintiff executed a general warranty deed purporting
to convey the land in dispute to his daughter June, and
in February, 1942, Inez executed a quitclaim deed, like-
wise purporting to convey the land to June. Both of
these deeds were prepared by Ernest J. Burrows, a
Portland attorney. His connection with the case came
about in this way:

The decree divorcing Inez from the plaintiff re-
quired the latter to pay $20.00 a month as support
money for June. Hanscom became delinquent in these
payments—or at least it is so claimed—and Inez em-
ployed Williams to enforce collection. Williams, after
some unsuccessful efforts, being, as he testified, too
busy with his general practice, suggested to Inez that
she put the matter in the hands of a young lawyer. As
a result Burrows was employed. During 1939, 1940 and
1941 June was a student at Oregon State College, and

while there her father sent her $20.00 a month for room and board. Upon completion of her course she went to California where she attended a business college, and later enlisted in the Marine Corps. She was in California at the time of the transactions now to be recounted.

Hanscom's deed to June above mentioned is not dated, but it was acknowledged under date of December 17, 1941. The consideration recited is "One and no/100 ($1.00) Dollars and other good and valuable consideration". The quitclaim deed which Inez executed to June is dated and acknowledged as of February 20, 1942. Although she was then the wife of Monroe she executed the deed under the name of Inez G. Hanscom, and the fact that she was a married woman is not recited. Both deeds, as stated, were prepared by Burrows.

According to Hanscom's testimony, he felt that since Inez was remarried she should no longer hold the title in her name, that it would be better to put it in the name of June, who was then of age, and to let her hold the title under the same agreement that he had with Inez. He testified that he proposed this to Inez and that she agreed, and that these deeds were executed accordingly. He further testified that he gave Burrows the same information which he had given Williams as to the reason for executing his deed, namely, to protect himself from a possible judgment; that he told Burrows that, since Inez was married, she should no longer hold the title; and that Burrows told him it was necessary for him "to give June a deed from me to hold in trust because Inez was only a holder of the title in trust." He said that he continued to rely on the advice that Williams had given him, and con-

sequently no provision was inserted in his deed to June requiring her to reconvey on his request. The evidence shows without dispute that Hanscom's deed was left with Burrows for delivery to Inez; that Inez received it and never delivered it to June.

Inez was called to the stand twice, first by the plaintiff and later by the defendant, June Hanscom. Under examination by counsel for the plaintiff she testified that she requested Burrows to make out a deed for Mr. Hanscom to sign—a deed to his daughter. Under cross-examination as a witness for the defendant she testified that she did not know why Hanscom made the deed to June, that she never mentioned to Hanscom that she wanted the deed for June, and that she did not mention to Burrows that it was necessary to get a deed from Hanscom. She denied that she ever at any time discussed the making of these deeds with Hanscom. Hanscom's deed to June, she testified, was delivered to her by Burrows and retained by her. She said that she had it in her possession all the time, and June testified that it was never delivered to her. Inez delivered her quitclaim deed to June sometime in 1945. Sometime after 1942, Inez testified, she caused to be inserted in this deed the following language: "Save and except a life estate which I reserve unto myself" and "subject to said life estate." She claimed that these additions were prepared and inserted by Burrows but Burrows had no recollection that he had done so. It is not disputed, however, that the reservation of a life estate to Inez was not in the quitclaim deed at the time that it was executed. There is no evidence that Hanscom agreed to this change; he testified that he never consented to it.

Mr. Burrows testified both at the trial before Judge Watts and subsequently by deposition. He said that

the drawing of the deed from Hanscom to June "was an arrangement between Inez Hanscom and myself", that Inez consulted him as a client. The only circumstance he could recall as to Hanscom being in his office was, that the description in the deed as originally prepared by him was erroneous, and he remembered Hanscom sitting in his private office while he took the deed to his secretary for correction. He could not recall that anything was said about a "trust". He could not say that "it was ever brought out in pointed language the actual purpose" of Hanscom's deed to June. He said that his primary relationship was one of collecting child support, that he had written to a Pendleton lawyer "with the purpose of trying to find out a means of raising money from that Umatilla farm land which Mr. William E. Hanscom had owned or had an interest in, and that in my letter I indicated that Mr. William E. Hanscom had ever maintained before the Domestic Relations Court of Multnomah County that he had deeded the property to his daughter June for the purpose of making up for the child support payments in which he had been delinquent." He said he would prefer to have the letter "on my person" at the time he testified on that matter. No one suggested that he get the letter and it was never produced.

Hanscom denied that he was delinquent in his payments of support money to June. He testified that he "turned over" his home in Laurelhurst, Portland, to provide some of the support money and some was paid out of the income from the land "which was ample to support June." He admitted on cross-examination, however, that he lost his home in Laurelhurst because he could not keep up his F. H. A. loan. Burrows testified that the amount of the delinquency was $418.00 and

that he was able to collect only a few small monthly payments.

. The widow of Joe Hanscom died in 1942, thus terminating the life estate. After her death Inez entered into a five-year lease of the land with Hanscom's brother, under which she received one-third of the annual crop. From then on she paid the taxes. She contributed from the proceeds of the crop to June's support, and she testified that she had recently given June between $1,500.00 and $2,000.00 to help her buy a home. Hanscom testified that after his wife divorced him he didn't mind Inez continuing to hold the title to the property so long as she helped June from the income.

As has been stated, Inez' quitclaim deed to June was not delivered to her until three years after its execution. So far as the record shows she had no knowledge of it until that time. June caused it to be recorded on May 28, 1946. In August, 1946, June was visiting at her father's home in Portland. He had at that time remarried. Hanscom testified:

> "Q State to the Court what conversation you had with your daughter in August, 1946, about this property concerning the arrangements you had made with her.
>
> "A We were having breakfast at home. June was here at that time on a visit and the conversation came up and she says, 'Dad, how much do you think that land would be worth?' and I said, 'At present prices, I should imagine $10,000 or $11,000. I wouldn't know the exact amount, but I just imagine it would be about that.' And I says, 'By the way, you are getting the income off it?' and she says, 'No. Part of it. Mother still holds the income off it as long as she lives.' I said, 'June, she had no right to give you title with that stipulation in

it. The land is mine. She was just to hold title in trust.' She said, 'I know that. I haven't been getting only just a little support.' That's the gist of our conversation outside she told me—I told her 'You know your mother had no right to deed that land with that proviso in it.' She said, 'I know it's your land. I have always understood that.'

"Q Was there any discussion of why the land was deeded to her mother in the first place?

"A. Yes. She said, 'I know the purpose of the land being given to mother was to protect the title for the time being.' I said, 'Yes. Until I got time to pay the obligation off that might come against it.'"

Mrs. Hanscom was present during the foregoing conversation and corroborated her husband's testimony.

June, called as a witness by the plaintiff, testified that her mother did not tell her that she had changed the quit claim deed after it was executed, and added "I always understood she had a life estate. I never knew anything else." She was later recalled as a witness by her own attorney. She testified that she knew that the land had been deeded to her mother, but there was no discussion of it until her Grandmother Hanscom died. She denied the conversation in August, 1946, testified to by her father and Mrs. Hanscom, although she admitted that she might on that occasion have asked her father out of curiosity about the value of the farm. She swore that when she told her father about the life interest reserved to her mother he made no response one way or another.

This suit was filed on June 26, 1947. June was married on June 29 and came to Portland. On the next day, according to the plaintiff's testimony, he asked

her in the presence of Mrs. Hanscom to go to the office of his attorney, Mr. Sandblast, and sign a deed to the property. She agreed to do so. On the way to the attorney's office she said, ''I don't feel right cutting off mother entirely because she helped me buy my home.'' Her father answered, ''June, you realize that was money off the ranch she used to help you out'', and she replied, ''I know that.'' This is according to the testimony of the plaintiff.

At the attorney's office, however, she refused to sign a form of bargain and sale deed presented to her by Sandblast. According to the plaintiff and Sandblast she first objected to the use of the words ''heirs'' or ''heirs and assigns'' in the deed, and, when Sandblast offered to prepare a quitclaim deed without those words, she still refused to sign, saying, according to her father, ''She didn't want to cut her mother off because she felt obligated to her by her helping her on this house she bought'', and, according to Sandblast, that ''She would like to have her mother get half of the income for her lifetime''.

June denied that she agreed with her father to sign a deed to him. She testified that her father did not tell her why they were going to Sandblast's office. ''The only angle was in regard to the land. He didn't know how to explain it to me. He told me the lawyer would explain that himself.'' Her answers on cross-examination about what occurred in Sandblast's office are evasive. She said, for example, that she did not remember whether her father had not said at that time (less than three months before the trial) that he had deeded the property to her mother to protect it from being levied on for the time being and that she had answered, ''Yes, I do. It was done to keep the

property in the Hanscom family.'' She did testify, however, that she ''didn't agree to sign it (the deed) until I had talked it over with my mother. I said 'It seems the fair thing to give half to my mother and half to my father' ''.

The foregoing constitutes, we believe, a fair summary of the evidence.

Thanks to the uses to which our affidavit of prejudice statute may be put, this court is faced with the task in this case of determining disputed questions of fact without the aid, ordinarily present in equity cases, of findings by a circuit judge who observed the witnesses when they were testifying. For Judge Watts, who heard the testimony, was not permitted to decide the case, while Judge Green, who was called in after Judge Watts was disqualified, was required to decide it on the same cold record that is before us.

■■ Moreover, the theory on which the case was submitted to Judge Green by the plaintiff's then attorney is not the same theory which has been presented in this court by the plaintiff's present attorney. The Circuit Court was told in a brief filed on behalf of the plaintiff that this is not a suit to establish a constructive trust but a suit ''for reformation of the deed of March 18, 1935  *   *   *  grounded upon a mistake both of law and of fact.'' The court held that the evidence did not justify the granting of that relief. In that conclusion the court was manifestly right. It is urged here, however, that this is a suit to establish a constructive trust, and we are met with the objection that the plaintiff is bound in this court by the theory pursued below and may not be heard to urge reversal of the decree on a different theory. 4 C. J. S., Appeal and Error, 479, § 241 e. That is the general rule and

it has been applied in numerous cases by this court. But, like most general rules it has its limitations and exceptions. See, idem., 485, § 242. As pointed out by Mr. Justice Rosenberry in *Cappon v. O'Day,* 165 Wis. 486, 162 N. W. 655, 1 A. L. R. 1657, it is a rule established "for the purpose of orderly administration and the attainment of justice   *   *   *   The reason for the rule is plain. If the question had been raised below, the situation might have been met by the opposite party by way of amendment or of additional proof." In the Wisconsin case the court of its own motion raised the question whether a chattel mortgage had been properly filed so as to make it valid as against third parties, held that the filing did not comply with the statute, and reversed the judgment notwithstanding that that question had not been raised in the court below. The question, the court said, "had been fully argued" and "the record is complete".

These things are true here. The question whether the defendants are constructive trustees for the plaintiff has been fully argued both orally and in the briefs. It is expressly conceded in the brief of June Hanscom that "all the evidence is in; there isn't any more." Although the complaint asks for reformation of the deed of March 18, 1935, it contains all the allegations that one might expect to find in a suit to establish a constructive trust, based upon a promise to reconvey, and concludes with a prayer for general relief. The transcript of testimony bears evidence that this is the kind of a case counsel for defendants thought they were required to meet, and there is nothing to indicate that they tried it any differently than they would have had the complaint in so many words prayed for a decree declaring the defendants to be constructive trus-

tees for the plaintiff. It is not of controlling importance that the complaint does not so label them or that it omits the use of the word "fraud" in characterizing their conduct. *Lytle v. Payette-Oregon Irr. Dist.,* 175 Or. 276, 293, 152 P. (2d) 934, 156 A. L. R. 894. In these circumstances this court, trying the case *de novo,* ought not to refrain from administering justice simply because an attorney advanced an erroneous theory of law in argument in the court below.

We deem it sufficiently clear from the evidence that the 1930 and 1935 deeds were given to Inez upon her promise to hold the title for the plaintiff and reconvey to him upon his request. It is difficult indeed to reach any other conclusion in view of the averments of the answers that the deeds were made by plaintiff "for the sole purpose of hindering, delaying or defrauding his creditors." Obviously these allegations, in answers which were filed after the hearing in the Circuit Court, were based upon the plaintiff's own testimony as to the reason which prompted him to transfer the title, namely, his fear of a judgment based upon his obligation upon an appearance bond. They confirm that testimony and leave no room for a contention that any other purpose was intended to be served. Indeed, there is not, either in the pleadings of the defendants or their testimony, any suggestion whatever as to the circumstances of the transfer or the motive of the plaintiff in making it, other than a faint-hearted answer by Inez, when pressed on cross-examination to state why she claimed to be the owner of the property, that "if your husband would deed you anything you would think he loved you." Nor is there any attempt in the briefs filed in this court to explain the transaction upon any other basis than

that to which the plaintiff testified except to invoke the presumption that where a husband conveys property to his wife a gift will be presumed. See *Bowns v. Bowns,* 184 Or. 603, 200 P. (2d) 586. This presumption, however, has been completely destroyed by the defendants' pleadings and the evidence. And, so far as there might be any question about the promise of the defendant, Inez Irwin, to reconvey, we think that the words of Judge Cardozo in *Sinclair v. Purdy,* 235 N. Y. 245, 139 N. E. 255, (a case of a conveyance by a man to his sister, made to escape the importunities of persons in trouble to go bail for them) have peculiar application here. ''Though'', he wrote, ''a promise in words was lacking, the whole transaction, it might be found, was 'instinct with an obligation' imperfectly expressed.''

We do not accept the plaintiff's version of his conversation with Mr. Williams at the plaintiff's home in 1935 when the second deed was executed. Mr. Williams is a reputable lawyer, and it is unthinkable that he should have sworn falsely. But the entire testimony of the plaintiff as to this matter may be disregarded without affecting the determination of the case.

Although Inez denied in her testimony all knowledge of the 1930 deed until several years later when her sister-in-law, Mrs. Furnish, told her of the error in the description, her answer admits that the deed was delivered to her, and her testimony about her conversation with Mrs. Furnish, quoted above, gives the distinct impression that she then learned for the first time, not that there was such a deed, but that a deed of which she was already aware contained an erroneous description. She then, according to her own

version, instead of taking the matter up with her husband and finding out why he had deeded property to her without telling her about it (which would have been the natural thing to do), consulted an attorney for the purpose of having the error corrected.

Her testimony that there was no agreement or understanding or discussion with her former husband relative to the execution of the warranty deed by Hanscom to June in December, 1941, and her own quitclaim deed to June in February, 1942, is too utterly unreasonable to be credited. She went so far as to swear on cross-examination that she did not mention to Burrows, her own attorney who prepared the deeds, that it was necessary to get a deed from Hanscom, after having previously sworn that Burrows drew this deed at her request. The deeds were directed to a common purpose. Hanscom's was left with the attorney for delivery to Inez, and she received it and retained it. Their execution conformed to the legal situation which the plaintiff claims then existed—a warranty deed from the equitable owner of the land, a quitclaim deed from the holder of the legal title. We find that the execution of these deeds was not a mere coincidence, but that they were executed pursuant to the understanding of the parties to which the plaintiff testified, for the purpose of transferring the legal title to June after Inez had remarried and June had come of age. The transaction was a clear recognition by Inez of Hanscom's equitable ownership. And her action in causing to be inserted in the quitclaim deed a provision reserving a life estate to herself, was a violation of the understanding. It was concealment, lending the color of actual fraud to her conduct.

We are unable to say from the evidence that Inez intended to repudiate her promise at the time she took the deed of conveyance either in 1930 or 1935. It could perhaps be plausibly argued that in March of 1935, when the correction deed was delivered to her, she had it in mind to leave her husband—as she did in the following June—and to walk off with his property. This, however, would be mere conjecture. The case presents the legal question, therefore, whether a court of equity may in any circumstances declare a constructive trust where property is transferred to one to hold for the transferor and upon the faith of the transferee's oral promise given in good faith to reconvey, but which subsequently he repudiates. Upon this question there is a division of judicial authority: some courts holding that to enforce the oral trust is a violation of the statute of frauds, which provides in this state that no trust concerning real property can be created, transferred or declared otherwise than by operation of law or by a conveyance or other instrument in writing, etc., § 2-905, O. C. L. A.; others, that where there is a fiduciary or confidential relation between the parties to the deed, it need not be shown that there was fraud, duress, undue influence or the like, at the inception of the transaction, but that a constructive trust arises where the confidential relation is abused by the refusal of the transferee to carry out his agreement.

In this state the course of decision on the question has been tortuous. In *Parrish v. Parrish,* 33 Or. 486, 495, 54 P. 352, the court, speaking through Mr. Justice Wolverton, said that it "is settled * * * that a mere failure to fulfill the promise is not fraud, and the statute applies in such a case; but if the evil intent

primarily existed * * * the transaction is fraudulent, and without the statute.'' In *Meek v. Meek,* 79 Or. 579, 591, 592, 156 P. 250, Mr. Justice McBride, speaking for the court, disapproved this dictum from the Parrish case and held that where the relation between the parties is confidential, as that of husband and wife, ''the betrayal of such confidence is constructively fraudulent, and gives rise to a constructive trust. This is independent of any element of actual fraud.'' In *Howard v. Foskett,* 96 Or. 446, 452, 189 P. 396, the court seemed to question whether it was possible to prove that a promise was made with the present intention of disregarding it. And in *Hornbeck v. Crawford,* 130 Or. 230, 279 P. 870, Mr. Justice Rand, while calling attention to the conflict in the authorities, quoted with apparent approval the dictum of Mr. Justice Wolverton in the Parrish case. Finally, in the recent case of *Bowns v. Bowns,* supra, which involved a transfer of property from husband to wife, the following statement from 54 Am. Jur., Trusts, 178, § 233, was quoted:

"A constructive trust arises where a conveyance is induced on the agreement of a fiduciary or confidant to hold in trust for a reconveyance or other purpose, where the fiduciary or confidential relationship is one upon which the grantor justifiably can and does rely and where the agreement is breached, since the breach of the agreement is an abuse of the confidence, and it is not necessary to establish such a trust to show fraud or intent not to perform the agreement when it was made.''

The court assumed without deciding that the foregoing is a correct enunciation of the law, but held that the evidence was insufficient in any view of the law to establish a constructive trust.

■ The rule as thus stated in American Jurisprudence has the approval of the American Law Institute (Restatement, Trusts, § 44 (1), (b), § 45 (1), (b) ); 4 Pomeroy's Eq. Jur. (5th ed.) 138, § 1056a; 3 Bogert, Trusts and Trustees, Part 1, pp. 219-222; and 1 Scott on Trusts, 253, § 44.2. See, also, 1 Perry on Trusts and Trustees, 297.

As formulated in the Restatement, ibid., the rule reads:

"(1) Where the owner of an interest in land transfers it inter vivos to another in trust for the transferor, but no memorandum properly evidencing the intention to create a trust is signed, and the transferee refused to perform the trust, the transferee holds the interest upon a constructive trust for the transferor, if　*　*　*

"(b) the transferee at the time of the transfer was in a confidential relation to the transferor *　*　* "

In the comment (1, b) it is said:

" * * * This is true even though at the time of the transfer the transferee intended to perform the oral trust, and even though he was not guilty of undue influence or other abuse of his confidential relation to the transferor in procuring the transfer. Such a confidential relation exists not only where there is a fiduciary relation such as exists between attorney and client, trustee and beneficiary, guardian and ward, and the like, but also where, because of family relationship or otherwise, the transferor is in fact accustomed to be guided by the judgment of the transferee or is justified in placing confidence in the belief that the transferee will act in the interest of the transferor * * * "

The idea of "restitution" and of the prevention of "unjust enrichment" upon which this doctrine

seems to be based may be found developed at some length by Professor Bogert in the pages of his work above cited. See, also, *Sinclair v. Purdy,* supra; *Hughes v. Helzer,* 182 Or. 205, 223, 185 P. (2d) 537; Restatement, Restitution, § 160. Without attempting to enlarge upon that phase of the matter, we think it sufficient to say that on a question of this kind, where competing reasons of apparently equal validity press for acceptance and have brought about diversity of decision among the courts, we are justified in following the lead of the American Law Institute and the other eminent authorities to which reference has been made. This is particularly true when it can be seen that to take the opposite course would result in the absolute denial of justice and of the opportunity to do justice in many cases. We therefore adopt as the law of this state in this class of cases the rule which we have quoted from the Restatement.

■ That the relationship of husband and wife is a confidential relationship within the meaning of this rule is held in numerous cases. *Brison v. Brison,* 75 Cal. 525, 17 P. 689, 7 Am. St. Rep. 189; *Hillyer v. Hynes,* 33 Cal. App. 506, 165 P. 718; *Taylor v. Bunnell,* 77 Cal. App. 525, 247 P. 240; *Kern v. Beatty,* 267 Ill. 127, 107 N. E. 794; *Miller v. Miller,* 266 Ill. 522, 107 N. E. 821; *Becker v. Neurath,* 149 Ky. 421, 149 S. W. 857; *Gallagher v. Gallagher,* 135 App. Div. 457, 120 N. Y. S. 18, 202 N. Y. 572, 96 N. E. 1115; *Shortridge v. Shortridge,* 207 Ky. 790, 270 S. W. 47; *Foreman v. Foreman,* 251 N. Y. 237, 167 N. E. 428; *MacRae v. MacRae,* 37 Ariz. 307, 294 P. 280. See, annotations, 35 A. L. R. 311; 45 A. L. R. 855; 80 A. L. R. 205; 129 A. L. R. 696; and 4 Pomeroy, Eq. Jur., (5th ed.) 138, Note 9.

■ The defendant Inez Irwin's refusal to honor her

agreement to reconvey the property to the plaintiff at his request was an abuse of this confidential relation. A constructive trust arose, empowering the court to enter a decree which, as Professor Bogert says, "puts the parties back in the position in which they were before the unenforceable trust was attempted". Bogert, op. cit., p. 221.

By the quitclaim deed from Inez, a mere trustee, June acquired no rights against her father's equity. *American Mortgage Co. v. Hutchinson,* 19 Or. 334, 341, 24 P. 515. The general warranty deed which Hanscom executed naming June as grantee never became effective as a deed because it was never delivered. If a deed is executed and deposited with a stranger to be delivered to the grantee, this may constitute a sufficient delivery to the grantee. *Jobse v. U. S. National Bank,* 142 Or. 692, 696, 21 P. (2d) 221, and Oregon cases there cited; and it will take effect as a deed if it is accepted by the grantee. 16 Am. Jur., Deeds, 525, § 157; 18 C. J., Deeds, 416, § 494 c; 26 C. J. S., Deeds, 254, § 51. But the deposit of this deed was coupled with a condition that the grantee should agree to reconvey on request. It was in the nature of an escrow (see, 26 C. J. S., Deeds, 244, § 43 b), and Inez had no authority to deliver the deed until she had exacted the promise from June. The condition was not illegal, for an oral trust is not a nullity, it is simply void at the election of the trustee. *Howard v. Foskett,* supra, 96 Or. 451.

The defendants contend that since Hanscom's purpose in conveying the land to Inez was to place it beyond the reach of a creditor, the transaction was binding between the parties, and the grantor has no standing to seek the aid of a court of equity to com-

pel a reconveyance. See, *Hornbeck v. Crawford,* supra, 130 Or. 238. There is no evidence that the plaintiff was indebted to anyone, either in 1930 or 1935, or that any creditor was hindered, delayed or defrauded as a result of the transfer. In that situation the decisions are not harmonious as to whether a conveyance can or cannot be deemed fraudulent to defeat creditors. 37 C. J. S., Fraudulent Conveyances, 1101, § 267 c; 27 C. J., Fraudulent Conveyances, 657, § 427. We are of the opinion that the sounder rule is that where there are no actual creditors to be defrauded, and there is only a mental purpose to hinder imaginary creditors, equity will relieve against a transfer of property in circumstances such as those here present. *Hoff v. Hoff,* 106 Kan. 542, 189 P. 613; *Vollaro v. Gargano,* 97 Conn. 275, 116 Atl. 179; *Warner v. Tullis,* 206 Ia. 680, 218 N. W. 575; *Day v. Lown,* 51 Ia. 364, 1 N. W. 786; *Gunderman v. Gunnison,* 39 Mich. 313; *Brady v. Ellison,* 3 N. C. 348; *Rivera v. White,* 94 Tex. 538, 63 S. W. 125. *Rivera v. White* was cited with approval by this court in *Gray v. Beard,* 66 Or. 59, 67, 133 P. 791, so that it may be said that this court is already committed to the doctrine of these decisions. See, also, *Smith v. Barnes,* 129 Or. 138, 160, 276 P. 1086. In this view, the plaintiff's motive for the conveyance will not prevent a court of equity from granting relief.

The decree of the Circuit Court is reversed, and a decree will be entered here declaring the defendants, Inez Irwin and June Hanscom (now Stevenson), to be constructive trustees of the property in controversy for the plaintiff, the equitable owner thereof, and that the said defendants shall within twenty days after the entry of the mandate in this case in the Circuit Court make, execute and deliver to the plaintiff appropriate

deeds conveying all the right, title and interest of each of them in and to said property to the plaintiff, and that, if they shall fail or neglect so to do, this decree shall stand and take effect as such deeds. No costs or disbursements will be allowed to any of the parties.