Argued September 14, 1970, affirmed March 24, 1971

ATKESON, *Appellant, v.* HOLLY ET UX,
*Respondents.*

482 P2d 737

*Willard Bodtker,* Albany, argued the cause for appellant. On the briefs were Long & Bodtker.

*Harrison M. Weatherford* and *Peter Powers,* Albany, argued the cause for respondents. With them on the briefs were Weatherford, Thompson, Horton & Jordan.

Before O'CONNELL, Chief Justice, and McALLISTER, HOLMAN, and TONGUE, Justices.

McALLISTER, J.

This is a separate case, but is treated in tandem with *Atkeson v. Evelyn E. Holly*, because, by stipulation of the parties, all of the evidence in that case was considered by the trial court in this case. Because the two cases are so closely related, it will be more convenient to combine this opinion as a sequel to the other.

This suit seeks cancellation of a deed executed by Anthony on September 6, 1967, conveying to Richard L. Holly and Evelyn E. Holly the 80-acre tract across the road from the house and the 3-acre tract that Anthony conveyed to them in December, 1965. There is no evidence of the value of the 80-acre tract. The trial court held that the Hollys did not obtain the deed by undue influence. Plaintiff appeals.

The Hollys testified that Anthony gave the property to them without any influence of any kind on their part. Richard Holly testified that Anthony first told him on September 2 or 3, 1967, that he intended to give the Hollys the 80 acres. At about the same time Anthony told Mrs. Holly of the intended gift and asked her to arrange for the conveyance. Mrs. Holly testified that she went to the Pioneer National Title Company in Corvallis where in 1965 she had arranged for the conveyance of the 3-acre tract. At the title company Mrs. Holly talked to a Mr. Foster, who gave her the legal description of the property and directed her to a lawyer who drew the deed. Mrs. Holly left the deed at the title company and returned to Corvallis on September 6 with Anthony. He remained in the car and Mrs. Holly brought Foster out to watch Anthony sign the deed.

Foster testified that Mrs. Holly introduced him to Anthony, that they exchanged remarks about the

weather, and that Mrs. Holly said to Anthony: "Mr. Foster will watch you sign your name to the deed", or "Sign your name" and that Mrs. Holly assisted Anthony when he signed. Foster had very little conversation with Anthony at that time and was not asked his opinion of Anthony's competency or mental condition. Foster notarized Anthony's signature and recorded the deed.

Mr. and Mrs. Holly's testimony that the land was a gift, and that they had no prior knowledge of Anthony's intention to give it to them, is supported by the testimony of Raymond Pamplin, who had known Anthony since about 1958, and who also knew Mr. Holly. He testified to a conversation with Anthony:

"* * * he was talking to me about them, he told me, he says, 'I have a surprise for Dick,' of course he did already know that he had give him the house there for care and he told me, he says that, 'They have been so good to me and all,' he says, 'I have another surprise for them that he don't know nothing,' and I suppose I knew it before Mr. Holly did, so he told me about it. * * *

"He told me, 'I have a surprise for him,' he says, 'I had this 80 acres saved back for him and I'm going to will that to him for the care that he's given me here and,' he said, 'he's given me a good home,' and so I didn't think no more about it, I knew that he was there."

Pamplin also testified that on a later occasion, some time in September or October of 1967, he was at the Holly home and the following took place:

"* * * I went in and talked to him a little while and he told me, he said, 'Well,' he says, 'I have done what I was going to do,' he says, 'I let Mr. Holly have the 80,' and Mr. Holly, then he told me later that he did, so that's all that I knew. I knew he told

me that he was going to before he ever let him have it."

There is slight additional support in the testimony of Leroy Burkey, a friend of Mr. Holly, who testified that in about mid-September of 1967 he visited with Anthony and defendants, and that Anthony told him he had "let Dick have that 80 to go with his place." Gary Holly, defendants' son, also testified that Anthony told him, on about September 8 or 9, that he had "let your dad have the 80 acres to go with the home place."

Plaintiff relies in a large measure on the deterioration in Anthony's physical condition during the summer of 1967 and his condition on September 6. We have referred in the prior opinion to Anthony's illness in late July. Dr. Varga testified that on July 26 Anthony was extremely weak, obviously had an infection, a temperature of 102, and could not respond to questions. The doctor saw Anthony daily until July 29 and then put him in the hospital where Anthony stayed until August 5, 1967. On August 12 Anthony returned to the hospital suffering with diarrhea, the flu and general weakness. He stayed in the hospital for 10 days and returned home on August 22.

Dr. Varga saw Anthony both on the day before and the day after he signed the deed, September 6. As to Anthony's condition on September 5, Dr. Varga testified:

"Q * * * I think you indicated on the 5th of September, 1967 you had—he was having some kind of a heart problem?

"A Well, he was having increased evidence of his congestive heart failure manifested by the swelling of his legs, at that time his blood pressure

was 140 over 90 which was a few points higher than what is normal for him."

As to Anthony's mental competence at that time, Dr. Varga further testified:

"Q Did you see him on the 6th day or was it just the 5th?

"A I saw him on the 5th and I saw him on the 7th. If I saw him on the 6th I have no record of this.

"Q Was there any material change between the 5th day and the 7th day of September of 1967 in the condition of Mr. Anthony?

"A Nothing that was apparent to me. The only time that since I assumed his full care after his stroke, after he left the hospital, the only times that he appeared to be having any difficulties with his mental faculties was when he was running that high fever and then the last, I would say, three, perhaps four days of his illness, of his terminal illness; otherwise, from one time to another that I would see him there was no essential change."

The doctor further testified that by September 29 it was necessary to put Anthony back in the hospital where he remained until his death on October 17, 1967.

As in the other case, there is no evidence directly indicating that the Hollys did anything to induce Anthony to deed the property to them, and no evidence to contradict their story that the idea for the gift originated with Anthony. If we are to hold that this deed was the result of undue influence, we must base that conclusion wholly on inferences drawn from the general situation.

■ This is a close case, but we are not convinced that this deed resulted from any improper influence on the part of the Hollys. In the first place, there is no evi-

dence· that Anthony was not mentally competent at the time he told the Hollys about this gift and signed the deed conveying the property to them. Dr. Varga testified that although Anthony was in poor physical condition his mental faculties were unimpaired until a few days before his death.

Secondly, the gift was not made in haste or in secrecy. It was several days after Mrs. Holly visited the title company and had the lawyer prepare the deed before she returned to Corvallis with Anthony for the execution of the deed. It is true that the gift was not publicized, but it appears to have been handled in a normal manner without any effort to conceal the transaction. The deed was promptly recorded after it was executed.

There is no evidence that Anthony had any independent advice before he gave the 80 acres to the Hollys. On the other hand, he had consulted his nephew when he sold his 100-acre tract and on other occasions. He had also consulted his lawyer when he executed a will in 1966. Independent advice was readily available and there is no indication that the Hollys influenced Anthony not to consult with his lawyer or relatives.

■ We think it is unrealistic to expect ordinary lay people, such as the Hollys, to insist that a donor, such as Anthony, seek independent advice before deeding this property to them. Independent advice is not an absolute condition precedent to a valid gift between ordinary people.[①]

---

[①] Some of our cases indicate that independent advice is practically indispensable to the validity of a gift or devise to the donor's attorney. Toomey v. Moore et ux, 213 Or 422, 431-432, 325 P2d 805 (1958); In re Lobb's Will, 177 Or 162, 188, 160 P2d

We find nothing unnatural or unjust about this gift. There is no evidence of any strong family ties between Anthony and his nephews and nieces. Plaintiff visited Anthony occasionally, but not frequently, and the other relatives visited Anthony only rarely. On the other hand, Anthony was apparently grateful to the Hollys for taking good care of him and treating him as a member of the family during the last two and one-half years of his life. He was entitled to give this property to the Hollys if he wanted to. There is no evidence that Anthony was easily influenced and ample evidence that he was fully capable of managing his own affairs.

The Hollys called a number of their friends who testified about the relationship between the Hollys and Anthony and about his mental and physical condition. There is nothing to indicate that the Hollys failed to call any witnesses whose testimony might have thrown any further light on the relationship. On

295 (1945); but see In re Brown's Estate, 165 Or 575, 586, 108 P2d 775 (1941). Where, however, the donee is a lay person, even though he is in a confidential relationship with the donor, the lack of independent advice, when relied on to hold a gift void for undue influence, has been one among a number of suspicious circumstances. See, e.g., Ramstead v. Bridges, 175 Or 182, 190, 152 P2d 306 (1944); In re Rupert's Estate, 152 Or 649, 54 P2d 274 (1936).

There is language in Gilliam v. Schoen, 176 Or 356, 364, 157 P2d 682 (1945) which could be read as imposing an absolute requirement that a donee who is in a confidential relationship with a donor insist that the donor have independent advice before making the gift. In that case, however, there were additional circumstances which were important to the conclusion that the gift was obtained by undue influence. We do not think it was intended to make independent advice a strict necessity in every case. At least where lay persons are concerned, we will consider the situation in its entirety, and a failure to secure independent advice will be given only the weight which the circumstances indicate it ought to have.

the other hand, the plaintiff called no independent witnesses to support his contentions of undue influence or impropriety on the part of the Hollys.

The trial judge had the benefit of observing the witnesses and hearing them testify and concluded that the gift of this property to the Hollys was not the result of any undue influence on their part. The findings of the trial judge are entitled to considerable weight. After a careful scrutiny of the evidence we agree that the deed should not be set aside.

The decree is affirmed.