Argued and submitted April 21, affirmed on appeal and cross-appeal September 27, McKee's reconsideration and Stoddard's reconsideration denied November 24, both petitions for review denied December 28, 1989 (308 Or 660)

McKEE et al,
*Respondents - Cross-Appellants,*

*v.*

STODDARD,
*Appellant - Cross-Respondent.*

(86-1-113; CA A47236)

780 P2d 736

George W. Kelly, Eugene, argued the cause and filed the briefs for appellant - cross-respondent.

Ferris F. Boothe, Portland, argued the cause and filed the briefs for respondents - cross-appellants.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

WARREN, J.

Buttler, P. J., concurring.

Rossman, J., dissenting.

### WARREN, J.

Defendant, as personal representative of the estate of Lucille McKee, appeals a judgment voiding, on the ground of undue influence, both Edward McKee's will, which gave all of his estate to his wife, Lucille, and all of the *inter vivos* property transfers that made her a joint owner. Plaintiffs cross-appeal, contending that the trial court erred in awarding Lucille's estate a one-half interest in Edward's estate under the intestacy statutes. ORS 112.025. On *de novo* review, we affirm on both the appeal and the cross-appeal.

Edward had been married to his first wife, Amy, for 47 years, and they raised three children, George, Vera and Virginia, plaintiffs in this action. Amy died on August 14, 1979. Edward was 73. Amy and Edward held all of their property in joint tenancy, and after her death, Edward had property worth approximately $201,000, including the family home and various stocks, bonds and certificates of deposit.

In the past, Edward and Amy had disclosed their financial status to their children on an annual basis. On September 11, 1979, Edward and his three children attended a meeting with their family attorney, Killeen, to discuss whether Edward should modify his 1972 will and to show Killeen a letter that Amy had left for Edward, requesting that he give each child "a substantial monetary gift" at the time of her death. Killeen advised Edward that there was no reason to make out a new will, if he still intended to benefit his children equally, which Edward said that he did. As a result of Amy's letter, there was a discussion about giving each child $30,000 and putting the rest of Edward's assets in joint ownership with the children. The exact arrangement was not finalized at that meeting. Later, Edward gave each child approximately $15,000, added their names to bank certificates and accounts as joint tenants and made each child a beneficiary of a life insurance policy. Virginia and George were dissatisfied with that distribution, and they both testified that Edward had promised to give them more.

Following Amy's death, Edward was extremely depressed and lonely. In December, 1979, he began seeing Lucille Scheve, age 59, who had been a neighbor. Her husband had died in March, 1979, leaving her an estate valued at

approximately $156,000. All parties agree that Edward's spirits improved markedly when he started seeing Lucille.

In March, 1980, plaintiffs went to Edward's home to sort through Amy's personal effects. Edward encouraged them to take whatever they wanted, but plaintiffs were reluctant to do so, because they did not want to risk further disruption of their father's life. Edward and Lucille had decided to marry and had set a date for sometime in August, 1980. Vera testified that, during that weekend, Lucille was at the family home and told them that "[w]hatever is McKee possessions will remain, and the same way that whatever belongs to me will someday belong to my children." According to plaintiffs, that comment was repeated several times by both Lucille and Edward during the weekend. The parties disagree on the meaning of the remark. Plaintiffs contend that it applied to Edward's entire estate; defendant contends that it applied only to the personal property in the family home.

Edward and Lucille were married in June, 1980, rather than in August, because Lucille had sold her home and needed a place to live and because they preferred to travel to his grandson's wedding as a married couple. After their honeymoon, Edward told a neighbor that, while he was gone, his children came to his house and took some things out of the china closet, that George had gone through his financial records and that, when he returned from the honeymoon, George had demanded his share of the assets and that he was very upset about the situation.

In March, 1981, Edward asked Virginia and George to come to his house to discuss matters. Plaintiffs thought that the purpose of the meeting was to discuss their father's estate plans and their mother's letter. George testified that, when he arrived, Lucille was "sitting very close to [his] father" and had a "smug look on her face." Virginia testified that she insisted that Edward disclose what he planned to do about Amy's letter. He responded, "I can't do anything about it. * * * I have some other commitments that I have to follow through." While reaching up and touching Edward's cheek, Lucille said, "He is seeing about my security." Edward told plaintiffs that he was unwilling to promise specific amounts to them at that time. Virginia believed that her father was dishonoring their mother's final request by not giving them more of the family

assets. At that meeting Lucille also asked Virginia why she resented her. Virginia responded, "Lucille, please try to understand. I really have had trouble dealing with this whole thing, with my mother dying. I accepted you with open arms to come into the family and I'm having trouble with it." George testified that, after Virginia left, Lucille became irate and told Edward that she needed stability and that she came first and the children second. That evening Virginia called Edward and told him that she was having trouble dealing with his decision and that it was best that she not see him for a while. That evening was the last time that she discussed her father's estate plans with him.

After that meeting, Edward's relationship with Virginia and George deteriorated. Virginia testified that she did not have any contact with Edward for five months following the March, 1981, meeting. Killeen testified that George contacted him to find out what he could do to get his father to convey more of his assets to the children in compliance with their mother's request. According to plaintiffs, Lucille "drove a wedge" between them and their father by, among other things, blocking their communication and curtailing their social activities with him. As further evidence of Lucille's interference, they also point to the fact that Edward no longer initiated contact with his grandson and that, since 1981, Edward and Lucille had refused their invitations for Christmas dinner. A friend of Edward's testified that Edward was "very upset" with his children, because "they ignored him" and "wanted their money right now."

Before his marriage to Lucille, Edward called Killeen to inquire about a prenuptial agreement. He became angry when Killeen insisted that Lucille have independent representation. Edward also believed that Killeen had revealed privileged matters to George. In June, 1980, Lucille contacted her attorney, Scott, and set up an appointment for Edward. At that meeting Edward expressed his displeasure with Killeen and told Scott that he was concerned about Lucille's welfare, because she had recently sold her home. Neither Lucille nor Edward mentioned a prenuptial agreement. Instead, Edward asked Scott to draft a will giving various securities to his children and the remainder of his estate, including the family home, to Lucille. The will also contained an "advisory request" that, on Lucille's death, she transfer the home to his

children. Although Lucille was present at the meeting, she did not participate in the conversation.

Edward never executed that will. After he received a letter from Scott in November, 1980, he called and told him that he could not decide what to do about the will but that he would contact him in the future. In March, 1981, after the confrontation with plaintiffs at the family meeting, Edward called Scott to notify him that he wanted to alter the provisions of his proposed will, because he was angry with his children for the way they had been treating Lucille. Edward was extremely upset during the conversation. Ten to fifteen minutes later, Scott received a call from Lucille, who was equally upset. She told Scott that she was trying to calm Edward, that they needed to see him to discuss the problem and that, when they came in, Scott was to "listen to [her]" and not to "tell [her] anything." Four days later, Edward called Scott and told him to delete those portions of the will that gave the securities to the children and to leave everything to Lucille.

Edward and Lucille went to Scott's office on April 16, 1981, to execute the will. Both Scott and his partner, Galton, were concerned about Edward's sudden change in attitude toward his children. Edward told both Scott and Galton that he was excluding plaintiffs from his will because of the March, 1981, confrontation and because of the disrespectful way they had been treating Lucille. Scott and Galton testified that they discussed "other alternatives" with Edward, which he rejected, and that Edward understood what he was doing. Lucille contributed very little to the discussion but periodically cried when Edward described their confrontation with his children and when he stated that his children had called Lucille a "gold digger." Edward signed the will. That same day, Lucille executed a will that specifically made no provision for Edward, because, according to her will, "[Edward] has sufficient assets to care for himself," and that gave plaintiffs the family home if Edward predeceased her. The family home and another piece of property were deeded to Edward and Lucille as tenants by the entirety. The latter property was originally deeded to Edward's sister, although Edward had purchased it. Before Edward's death, and at his direction, his sister executed a deed that made him and Lucille joint owners. At Scott's suggestion, Edward made Lucille a

joint owner of all of his other assets. Edward died in February, 1984. All of the assets jointly owned passed outside of his will.

A few weeks after Edward's funeral, George and Virginia went to Edward's residence with a list of personal property and asked Lucille to get the items. She became angry and started to collect some of the items on the list but stopped when her daughter told her not to give them anything else. George testified that Lucille told them that Edward did not love them and that she never wanted to see them again. In September, 1984, Lucille executed a new will that gave all of her real and personal property to her two children and specifically made no provision for Edward's children.

The trial court voided Edward's will and all of his *inter vivos* transfers on the ground of undue influence. It concluded that his 1972 will had been revoked by operation of law because of his marriage to Lucille and that he had died intestate. The court imposed a constructive trust on the property that was the subject of the voided transfers and held that, pursuant to the intestacy statutes, Lucille's estate was entitled to a one-half interest in Edward's estate.

■ The burden of proving undue influence is usually on the contestants of a will but, when there are both a "confidential relationship" and "suspicious circumstances," an inference of undue influence arises, and the beneficiary is required to "go forward with the proof and present evidence sufficient to overcome the adverse inference * * *." *In re Reddaway's Estate,* 214 Or 410, 420, 329 P2d 886 (1958). The same test applies to wills and to deeds. *Ryan v. Colombo,* 77 Or App 71, 77, 712 P2d 139 (1985). Defendant contends that there was no confidential relationship between Edward and Lucille, that there are no suspicious circumstances and that there was no undue influence.

■ ■ We conclude that there was a confidential relationship between Edward and Lucille as husband and wife. *See Osterberg v. Osterberg,* 278 Or 277, 282, 563 P2d 696 (1977); *Hanscom v. Irwin,* 186 Or 541, 566, 208 P2d 330 (1949). The next inquiry is whether there are suspicious circumstances giving rise to an inference of undue influence. The appellate courts have identified several factors to assist in that determination. *See, e.g., Penn v. Barrett,* 273 Or 471, 476-80, 541 P2d 1282 (1975); *In re Reddaway's Estate, supra,* 214 Or at

421-27; *Stricklin v. Stricklin,* 97 Or App 227, 231, 776 P2d 18 (1989); *Ryan v. Colombo, supra,* 77 Or App at 77. In this case, numerous circumstances arouse suspicion: Lucille's involvement in the preparation of Edward's will and the *inter vivos* transfers, her failure to seek independent legal advice for Edward, Edward's change in the disposition of his property, his change in his attitude toward plaintiffs and his disinheritance of them, although as his children, they were the natural objects of his bounty. The remaining question is whether defendant's evidence is sufficient to overcome the inference of undue influence. We conclude that it is not.

Regarding Edward's change in attitude toward plaintiffs and his disinheritance of them, defendant contends that it was plaintiffs' conduct, and not Lucille's, that caused Edward to disinherit them. There is evidence that Edward altered his will and the ownership of his other assets to exclude plaintiffs shortly after Virginia became angry after his refusal to make further distributions of his property and then refused to see him for several months. The change also occurred after George contacted Killeen to learn how the children could get more of his assets. We infer that Edward learned of that contact, because he became upset with Killeen for discussing his financial situation with George. That evidence provides reasons why Edward could decide to disinherit Virginia and George. Edward, however, also disinherited Vera, and the record does not disclose any conduct on her part that would have placed her in disfavor, nor does it explain why she was excluded from his testamentary plan. Defendant has failed to overcome the adverse inference that arises from Edward's inexplicable disinheritance of Vera.

Additionally, Lucille participated in the preparation of Edward's will and the *inter vivos* transactions by contacting *her* attorney and setting up an appointment for Edward and by being present when he signed his will and when the deeds were prepared. She also failed to obtain or advise of the need for independent and disinterested legal advice for Edward. There is no indication in the record that she encouraged him to contact Killeen or that she made efforts to communicate with plaintiffs or some other person to secure independent advice for him. *See Troyer v. Plackett,* 48 Or App 497, 501, 617 P2d 305 (1980).

The Supreme Court has held that a beneficiary who participates in the preparation of a will and occupies a confidential relationship to the testator has a duty to see that the testator receives independent, disinterested advice. *In re Reddaway's Estate, supra,* 214 Or at 422; *Toomey v. Moore,* 213 Or 422, 431, 325 P2d 805 (1958); *see also Gilliam v. Schoen,* 176 Or 356, 364, 157 P2d 682 (1945). Although independent advice is not a strict necessity in every case involving a gift between lay persons, we conclude that, under the circumstances here, where the testator-grantor had had a previous marriage of 47 years and a good relationship with his children and where the transactions in favor of the new spouse resulted in the sudden and complete disinheritance of the children, the lack of independent counsel is a significant factor in determining whether there was undue influence. *See Atkeson v. Holly,* 258 Or 276, 281 n 1, 482 P2d 737 (1971); *Ryan v. Colombo, supra,* 77 Or App at 80.

Defendant contends that Edward received independent advice from Scott and Galton, both of whom testified that they had discussed "other alternatives" with Edward and that he knew what he was doing when he altered his will and the ownership of his other assets. However, the record does not indicate what alternatives were discussed or whether Edward understood the finality of making Lucille a joint owner on the deeds and the accounts. Scott also testified that he never thought of recommending independent counsel. The attorneys' testimony addresses Edward's legal competency only and not whether he was unduly influenced. Under those circumstances, we are not able to say that either Scott, who had been Lucille's family attorney for many years, or Galton gave Edward independent advice and counsel.

On the record before us, we hold that defendant has failed to overcome the inference of undue influence. The trial court did not err in voiding the will and in setting aside the *inter vivos* transfers.

On cross-appeal, plaintiffs contend that the trial court erred in awarding Lucille's estate a one-half interest in Edward's estate pursuant to the laws of intestacy and that her estate is entitled to nothing. That argument has no merit. When property transfers are set aside on the ground of undue influence, ownership is returned to the pretransfer owner.

Edward was the previous owner of all of the property that was transferred. He was the sole owner of the family home before he executed the deed making Lucille a joint owner. The record also indicates that Edward's sister intended to deed her property to Edward only, and we conclude that Edward's request that Lucille be put on the deed was also a product of undue influence. Additionally, when Edward removed plaintiffs' names from the accounts and added Lucille as a joint owner, for a brief time he was the sole owner of those accounts. Because Edward died intestate, the distribution of all of his property is governed by the laws of intestacy.

Affirmed on appeal and on cross-appeal.

**BUTTLER, P. J.**, concurring.

Although I agree with the lead opinion's conclusion on the appeal and cross-appeal, I write separately to clarify a point of law and to amplify and emphasize the facts that I perceive to be material.

First, the lead opinion makes the conclusory statement that "there was a confidential relationship between Edward and Lucille as husband and wife." 98 Or App at 520. That is not enough to trigger the inference of undue influence, even if there are suspicious circumstances. *In re Reddaway's Estate,* 214 Or 410, 420, 329 P2d 886 (1958). There must also be, in addition to what may be generally perceived to be a confidential relationship, evidence that the "relationship is such as to indicate a position of dominance by the one in whom confidence is reposed over the other." *Doneen v. Craven, Executor et al,* 204 Or 512, 522, 284 P2d 758 (1955); *In re Reddaway's Estate, supra.*

The record here is replete with evidence that Lucille was an assertive person, more than 13 years younger than Edward, that Edward was devastated by the death of Amy, his wife for over 47 years, and that, when he started seeing Lucille, he was lonely and vulnerable. A psychiatrist testified that, when Lucille came into his life, Edward was an easy target. About five months after Amy's death, Lucille and Edward decided to be married in August of 1980. Lucille proceeded to sell her house but said that she would not move in with Edward unless they were married and would not travel to California with him to attend his grandson's wedding unless

they were married. Accordingly, their wedding was moved up to June 11. After that decision was made, Lucille moved into Edward's home—before their wedding.

Before the marriage, Edward was interested in a pre-nuptial agreement and consulted his long-time friend and attorney, Killeen, who advised him correctly and appropriately that it would be necessary for Lucille to have independent counsel. Edward did not return to Killeen; instead, Lucille directed him to Scott, who was her attorney, had been the attorney for her son and her daughter and had probated her deceased husband's estate. She made an appointment for early June, 1980, before the parties were married. As the lead opinion points out, in March, Lucille had stated, in effect, to Edward's children that what was Edward's would remain his and what was hers would remain hers. By the time of their appointment with Scott, the theme was that part of what was Edward's would remain his and all of hers would remain hers. After the wedding, the theme was that essentially all of what was Edward's was to be hers, and all of hers was to be hers.

The evidence is convincing that Edward reposed confidence in Lucille and that she was in a position of dominance over him.

At no time after Lucille directed Edward to Scott was a pre-nuptial agreement mentioned. Lucille was present during all of their conferences with Scott and participated to a significant extent in the discussions; Scott was to prepare wills for both of them. Scott's letters were addressed to both of them. There is no evidence that Scott suggested that Edward retain separate counsel or that he confer privately with Edward. Neither is there any evidence that he explained to Edward that a will could be revoked but that a deed to Lucille as a tenant by the entirety could not be. Yet Scott prepared two deeds by which Edward created tenancies by the entirety with Lucille. There is no evidence that Edward was advised that, if he wanted to have Lucille live in his home after his death, that could be accomplished by giving her a life estate or by creating a trust. The same is true with respect to his substantial liquid income-producing assets. Scott stated only that "other alternatives" were discussed, which tells us nothing. Galton did not testify, as the lead opinion states, that *he* discussed other alternatives with Edward. Rather, he said that

he told Edward that there were other alternatives and asked him if he had been advised of "those." Edward said that he had.

It is clear that Edward needed and should have had independent advice. As the court stated in *Toomey v. Moore et ux,* 213 Or 422, 431, 325 P2d 805 (1958):

> "This court has uniformly held that it is the duty of a beneficiary who participates in the preparation of a will and who occupies a confidential or fiduciary relationship to the testator to see that the testator receives independent and disinterested advice."

In *In re Reddaway's Estate, supra,* the court reiterated that statement. The same rule applies to a donee who occupies a confidential relationship to the donor and who participates in a consummation of the gift. *Toomey v. Moore et ux, supra.* Not only did Edward not receive independent advice, he was steered away from it. Although defendant contends that Edward did not consult Killeen, his long-time friend and attorney, because Killeen had disclosed Edward's financial condition to his son, I agree with the trial court that that is not credible, because the family finances had been discussed regularly and openly among the family. Edward was taken to Lucille's attorney.

Even though both deeds relating to Edward's real property had been executed before April 16, 1981, Edward's will, executed on that date, left "his" home to Lucille and contained precatory language expressing the hope that she would leave the family home to his children. Lucille's will, signed the same day, gave nothing to Edward but left the family home to his children. Very shortly after his death, she revoked that provision. The *coup* was complete.

It is a rare case in which undue influence can be shown by direct evidence; the influence usually is shown by reasonable inferences that may be drawn from the evidence. The ultimate question is whether "the influencer by his conduct gained an unfair advantage by devices which reasonable men regard as improper?" *In re Reddaway's Estate, supra,* 214 Or at 419. The kinds of suspicious circumstances identified in that case are present here, as the lead opinion states. I have elaborated on two of them, procurement and the lack of independent advice.

The unjustness of the gifts, another factor, also needs some elaboration. Although it was perfectly natural for Edward to want to provide for Lucille, there were other ways to accomplish that objective. Further, when it is considered that Lucille had inherited in excess of $150,000 from her first husband, it is difficult to understand why Edward would have given Lucille the house that was not their residence and essentially all of his personal fortune, cutting off his children entirely. The lead opinion sets out parts of the record that might tend to explain Edward's complete about-face, but does not find those facts to be true. The trial court expressly found that plaintiffs were credible and that defendant's evidence to which the majority refers—that it was plaintiffs' greed that broke up their relationship with Edward—was not credible. I agree with the trial court. Because there existed a confidential relationship in which Lucille was dominant and there are suspicious circumstances, an inference of undue influence arises, and I agree that defendant did not fulfill her burden to overcome that inference. The sum and substance of this case is that Lucille took over Edward's life and drove a wedge between him and his children, even his young grandson with whom he had been close and with whom he had initiated contact regularly before Lucille came into his life.

Accordingly, I concur in the disposition of the appeal and the cross-appeal.

**ROSSMAN, J.,** dissenting.

What do the trial court and the majority have against Lucille? The trial court characterized her as "a good woman [who] really cared for Edward," then, in an about-face, found that Edward's will and *inter vivos* transfers were the products of her undue influence. The lead opinion supports its conclusion that she exerted undue influence on him, *inter alia,* by the damaging fact that she sat close to him and touched his cheek when he told the children that he could not promise specific amounts to them. Neither a wife's touch nor any of the other facts recited in the lead opinion are circumstances suspicious enough to give rise to an inference of undue influence. Because there is absolutely no real evidence in this record that would allow a characterization of Lucille as a conniving villainess bent on depriving Edward's children of their rightful inheritence, I dissent.

According to the majority, Edward's disinheritance of Vera can be explained only by Lucille's undue influence. That is nonsense. Undoubtedly, Lucille's presence in Edward's life caused him to change his testamentary plans. That is easily explained, however, by his gratitude to her for companionship after the death of his first wife and by the couple's mutual devotion. There is no evidence that Lucille ever discussed Edward's testamentary plans with him. Truly, her conduct was quite unremarkable. Shows of affection between a man and woman or tears in a lawyer's office when an unpleasant situation is described do not support finding the kind of improper influence necessary to strike down a will.

The lead opinion concludes that Lucille's "participation" in the preparation of Edward's will and deed transfers "by contacting *her* attorney," by setting up an appointment for Edward, by being present when he signed his will and by failing "to personally obtain independent and disinterested legal advice" for Edward raises an inference of undue influence. 98 Or App at 521. That argument ignores evidence that (1) Edward had earlier rejected services from his own attorney; (2) he did so *because* the attorney had insisted that Lucille have independent representation; (3) Edward, not Lucille, called Scott with instructions to write a will leaving everything to Lucille; (4) Scott and Galton both discussed alternatives with Edward, but he rejected them; and (5) Scott and Galton believed that Edward understood the consequences of his actions. Those circumstances do not support a conclusion that Lucille was luring Edward into a trap by arranging to have *her* attorney draft a will or by preventing him from obtaining independent advice. It is ludicrous to contend that it is suspicious for one spouse to be present while both spouses sign their wills or to fail to insist that the other spouse have independent representation.

The concurrence correctly points out that, if a confidential relationship is to raise an inference of undue influence, there must be evidence that the one exerting the influence was in a position of dominance. It then concludes that a 59-year old woman assumes that role by being "assertive," refusing to move in with her husband-to-be until they are married and marrying an older man. Surely more is required to support a conclusion of dominance. I recognize that the lead opinion does not rely on any one fact to support its conclusion. In my

view, however, even when the facts it points to are considered collectively, they do not provide a sufficient basis for voiding Edward's will and *inter vivos* transfers.

In short, it seems to me that the only exercise that the majority has had lately is jumping to conclusions. Accordingly, I dissent.